# EXHIBIT A-5

# AT&T'S RESPONSE
# TO CORETEL'S SECOND SET OF
# INTERROGATORIES

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| CORE COMMUNICATIONS, INC.,<br>CORETEL DELAWARE, INC.,<br>CORETEL NEW JERSEY, INC.,<br>CORETEL VIRGINIA, LLC, and<br>CORETEL WEST VIRGINIA, INC.,<br><br>                Plaintiffs,<br><br>   v.<br><br>AT&T CORP.,<br><br>                Defendant. | Civil Action No.  2:21-cv-02771-JDW<br><br>Hon. JOSHUA D. WOLSON |

## DEFENDANT AT&T CORP.'S OBJECTIONS AND WRITTEN RESPONSES TO PLAINTIFFS' SECOND SET OF INTERROGATORIES

Defendant AT&T Corp. ("AT&T"), pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, hereby submits the following objections and responses to Plaintiffs Core Communications Inc., CoreTel Delaware, Inc., CoreTel New Jersey, Inc., CoreTel Virginia, LLC, and CoreTel West Virginia, Inc.'s (together, "Core") Second Set of Interrogatories (the "Interrogatories").

## PRELIMINARY STATEMENT

Any information provided by AT&T in response to the Interrogatories is made on the basis of information available to AT&T at the time of gathering responsive materials or information, within the limits of, and subject to, AT&T's general and specific objections to the Interrogatories, together with their accompanying Instructions and Definitions.  AT&T reserves the right to supplement or modify its responses and objections to the Interrogatories if additional information becomes available, known, and/or understood.

The fact that AT&T is willing to provide responsive information to any particular Interrogatory does not constitute an admission or acknowledgement that the Interrogatory is proper, that the information it seeks is within the proper bounds of discovery, or that other requests for similar information will be treated in similar fashion.

AT&T does not waive, and specifically reserves, its rights to challenge the competency, relevancy, materiality, and/or admissibility of any information provided in response to the Interrogatories.

## **GENERAL OBJECTIONS**

The following objections are made to each of the Interrogatories and are incorporated by reference into the response to each Interrogatories made below.

1.      AT&T objects to the Interrogatories, together with their accompanying Definitions and Instructions, to the extent they seek to impose obligations beyond those prescribed by the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Eastern District of Pennsylvania, or other applicable law.

2.      AT&T objects to the Interrogatories, together with their accompanying Definitions and Instructions, to the extent that they seek information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or any other applicable privilege or protection from disclosure.  Specifically, and without limitation, AT&T objects to each and every Interrogatory to the extent each seeks information concerning any confidential communications between or among current or former AT&T employees and counsel for AT&T or persons working at their direction relating to counsel's provision of legal advice to AT&T, including relating to AT&T' investigation or investigations related to the subject matter of the Action[1] and counsel's

---

[1] The term "Action" is defined to mean the above-captioned litigation in the United States District Court for the Eastern District of Pennsylvania.

work product related thereto.  AT&T will not include any such information in response to any Interrogatory.  Further, AT&T does not intend to, and expressly does not, waive any such privileges or protections in answering or otherwise responding to these Interrogatories.  The inadvertent disclosure of any privileged or otherwise protected information shall not be deemed or construed to constitute a waiver of any applicable privilege, doctrine, or immunity.

3.      AT&T objects to the Interrogatories, together with their accompanying Definitions and Instructions, to the extent they seek confidential or proprietary business information or personal confidential information.  Any such responsive, non-privileged information will be provided pursuant to, and subject to, the Protective Order entered by the Court on April 21, 2022 at Docket No. 45.

4.      AT&T objects to the Interrogatories, together with their accompanying Definitions and Instructions, to the extent that they seek information that is not available to AT&T.

5.      AT&T objects to the Interrogatories, together with their accompanying Definitions and Instructions, to the extent they seek information that is publicly available to, or already in the possession of, Core or its counsel.

6.      AT&T objects to the Interrogatories, together with their accompanying Definitions and Instructions, to the extent they: (a) are overly broad; (b) are impermissibly vague and ambiguous and fail to describe with particularity the information sought; (c) seek information that is not relevant to the claims or defenses of either party to this Action; (d) are not reasonably calculated to lead to the discovery of admissible evidence; (e) disproportionate to the needs of the case; and/or (f) impose undue burdens that outweigh any probative value the information may have in this Action.

7.      AT&T objects to the Interrogatories, together with their accompanying Definitions and Instructions, to the extent they imply the existence of facts or circumstances that do not or did not exist, and to the extent they purport to require AT&T to set forth or state legal conclusions.  In providing its responses and objections, AT&T does not admit the factual or legal premise of any of the Interrogatories.

8.      AT&T objects to the Interrogatories, together with their accompanying Instructions and Definitions, to the extent they ask AT&T to provide information that AT&T does not maintain in the ordinary course of business, and/or that would require AT&T to undertake unduly burdensome efforts to respond.  AT&T will restrict its responses to information that is reasonably available to it, including from existing documents or records.

9.      AT&T objects to the Interrogatories, together with their accompanying Instructions and Definitions, to the extent they seek information duplicative of the information sought by Core in its First Set of Interrogatories, dated January 4, 2022 (the "First Interrogatories," and each separately a "First Interrogatory") or Core's First Requests for Production of Documents, dated January 4, 2022 (the "First Requests," and each separately a "First Request").

10.     AT&T objects to the Interrogatories, together with their accompanying Instructions and Definitions, to the extent they exceed the 25 interrogatory limit set by Rule 33 of the Federal Rules of Civil Procedure, including discrete subparts.  Core propounded 18 interrogatories on AT&T through its First Interrogatories, and purports to propound an additional 14 interrogatories on AT&T through these Interrogatories, for a total of 32 interrogatories (not including discrete subparts).  AT&T will not respond to these Interrogatories to the extent they go beyond Core's 25 interrogatory limit.

## <u>INTERROGATORIES</u>

**INTERROGATORY NO. 1:**

Identify by Bates number the "numerous studies" referenced in Craig John's letters dated September 21, 2018 and October 16, 2018, copies of which are attached hereto as Exhibits A and B, respectively, from which AT&T "determined that virtually 100% of [CoreTel's originating access usage] was associated with spoofed and/or fraudulent traffic." (Please note, Mr. John's September 21, 2018 letter is misdated September 21, 2016).

**RESPONSE TO INTERROGATORY NO. 1:**

AT&T objects to Interrogatory No. 1 on the grounds that the term "studies" is and undefined and has multiple definitions. AT&T further objects to Interrogatory No. 1 on the grounds that it seeks information that is already in the possession of Core. AT&T further objects to Interrogatory No. 1 on the grounds that it is duplicative of First Interrogatory No. 17, which requests that AT&T "identify all studies and analyses of any kind that AT&T has done . . . regarding the legitimacy of 8YY traffic Core has sent to AT&T." AT&T responded to First Interrogatory No. 17 by referring Core "to the business records produced in response to Core's" First Requests, pursuant to Fed. R. Civ. P. 33(d)(1).

Subject to and without waiving these objections and its General Objections, pursuant to Fed. R. Civ. P. 33(d)(1), AT&T refers Core to Exhibit 1, attached hereto and incorporated by reference. Exhibit 1 reflects the Bates numbers for business records that are responsive to this Interrogatory. AT&T further directs Core to Exhibit 2, attached hereto and incorporated by reference. Exhibit 2 is a spreadsheet identifying Bates numbers of the documents AT&T produced that are responsive to Core's First Interrogatory No. 17. Exhibit 2 reflects an updated version of the spreadsheet provided by AT&T's counsel to Core's counsel on August 10, 2022. Discovery

in this matter is ongoing, and AT&T reserves its right to supplement this response if additional documents are produced in response to Core's First Requests.

**INTERROGATORY NO. 2:**

Describe in detail how AT&T reached its determination "that virtually 100% of [CoreTel's originating access usage] was associated with spoofed and/or fraudulent traffic," as expressed in the letters attached at Exhibits A and B from Mr. John, and identify the person or persons who made this determination, identify the date this determination was made and identify with particularity any documents relied upon in making this determination.

**RESPONSE TO INTERROGATORY NO. 2:**

AT&T objects to Interrogatory No. 2 on the grounds that it seeks information that is already in the possession of Core.  AT&T further objects to the terms "fraudulent" and "spoofed" as they are undefined and have multiple definitions.  AT&T further objects to the extent Interrogatory No. 2 seeks information protected by attorney-client privilege and/or attorney work product doctrine. AT&T further objects to Interrogatory No. 2 to the extent it is duplicative of First Interrogatory No. 16, which requested that AT&T "[s]tate all facts and identify all documents that support in any way your claim that 8YY traffic sent by Core to AT&T is fraudulent and/or illegitimate." AT&T further objects to this Interrogatory to the extent it is duplicative of First Request No. 2, which requested that AT&T produce "copies of any and all traffic studies or analyses of any kind performed by AT&T . . . . includ[ing] . . . the studies referenced in Craig John's letters, dated September 21, 2018 and October 16, 2018."

Subject to and without waiving these objections and its General Objections, AT&T responds by incorporating by reference its response to First Interrogatory No. 16, and directs Core to AT&T's June 22, 2022 production, which contains documents responsive to First Request No. 2.  AT&T further states that the following are the primary individuals that have knowledge

regarding AT&T's determinations that a significant portion of the call traffic that Core sent to AT&T was illegitimate traffic: Kim Meola, Ardell Burgess, Craig John, Adam Panagia, Zeeshan Ali and Marion Myrick.

**INTERROGATORY NO. 3:**

State whether AT&T made any determinations after October 16, 2018 as to the percentage of CoreTel's originating access usage that was associated with spoofed and/or fraudulent traffic and, if so, describe in detail the determination that was made and how it was reached, and identify the person or persons who made this determination and the date this determination was made and identify with particularity any documents relied upon in making this determination.

**RESPONSE TO INTERROGATORY NO. 3:**

AT&T objects to Interrogatory No. 3 to the extent it prematurely calls for an expert opinion. Any expert analysis of Core's traffic will be provided in accordance with the Court's scheduling order. AT&T further objects to Interrogatory No. 3 on the grounds that it seeks information that is already in the possession of Core. AT&T further objects to the term "fraudulent" and "spoofed" as they are undefined and have multiple definitions. AT&T further objects to the extent Interrogatory No. 3 seeks information protected by attorney-client privilege and/or attorney work product doctrine. AT&T further objects to Interrogatory No. 3 to the extent it is duplicative of First Interrogatory No. 16 which requested that AT&T "[s]tate all facts and identify all documents that support in any way your claim that 8YY traffic sent by Core to AT&T is fraudulent and/or illegitimate." AT&T further objects to this Interrogatory to the extent it is duplicative of First Request No. 2, which requested that AT&T produce "copies of any and all traffic studies or analyses of any kind performed by AT&T . . . . includ[ing] . . . the studies referenced in Craig John's letters, dated September 21, 2018 and October 16, 2018."

7

Subject to and without waiving these objections and its General Objections, AT&T responds by incorporating by reference its response to First Interrogatory No. 16 .

**INTERROGATORY NO. 4:**

For the period from June 1, 2018 to the present, describe in detail all processes that AT&T used, or any other steps that AT&T took, to assess the legitimacy of 8YY traffic delivered by CoreTel to AT&T (whether through a third party tandem provider or otherwise), including when AT&T implemented such processes or took such steps, the individuals responsible for developing and implementing such processes or taking such steps, and any algorithms AT&T used to detect and/or block suspicious traffic.

**RESPONSE TO INTERROGATORY NO. 4:**

AT&T objects to Interrogatory No. 4 to the extent that it assumes that AT&T had or has the burden to take specific "steps" or "processes" to prove to Core that the traffic that Core routed was not legitimate and that it seeks information that is irrelevant to the claims and defenses at issue in this litigation.  Nothing in Core's tariff, or in the regulations of the Federal Communications Commission ("FCC"), requires AT&T to take particular "steps" or "processes" to assess Core's traffic; after review of Core's invoices and other information, *see, e.g.*, AT&T's Resp. to Interrogatory No. 1, *supra*, AT&T properly disputed and raised its concerns with Core's traffic in various written and oral communications.  Rather than rely on AT&T or other providers to police and assess the legitimacy of Core's traffic, it is Core's obligation to assess the legitimacy of the traffic it delivers to AT&T and its customers.  *See In re Matter of Core Communications, Inc. et al., Tariff F.C.C. No. 3*, 36 FCC Rcd 15128, ¶¶ 41-44 (2021) ("*Core Order*")*.*  Core has already attempted to impermissibly shift its burden to AT&T through various proposed tariff revisions before the FCC, including revisions that would have established "a presumption that all toll free

8

calls that Core sends to an IXC, and that an IXC does not block in real time, are 'legal traffic' that the IXC must pay Core for transmitting." *Id.* at ¶ 41. The FCC rejected Core's position, recognizing that "Core has a primary role of detecting and preventing illegitimate traffic, given its upstream position in the call flow, direct customer relationships, and status as the point of entry to the [public switched telephone network] from [Voice over Internet Protocol] providers." *Id.* at ¶ 44 (internal quotation marks omitted). Indeed, "Core is in a better position to identify the sources of and take steps to mitigate the impact of that traffic on downstream voice service providers," and "no [FCC] order or rule supports an effort by Core to justifiably claim that IXCs are better positioned than Core to prevent or block fraudulent calls at their source." *Id.* As such, what processes AT&T used to assess the legitimacy of Core's traffic is irrelevant to the claims and defenses in this case. AT&T hereafter refers to this objection as the "Legitimacy Burden Objection."

AT&T further objects to Interrogatory No. 4 on the grounds that it seeks information that is already in the possession of Core. AT&T further objects to the extent Interrogatory No. 4 seeks information protected by attorney-client privilege and/or attorney work product doctrine. AT&T further objects to Interrogatory No. 4 on the grounds that it is unduly burdensome and disproportionate to the needs of this case.

Subject to and without waiving these objections and its General Objections, AT&T responds by incorporating by reference its response to First Interrogatory No. 16.

**INTERROGATORY NO. 5:**

State whether AT&T at any time from June 1, 2018 to the present has blocked CoreTel from delivering 8YY traffic to AT&T and, if so, identify the date(s) the blocking occurred and the basis for such action.

**RESPONSE TO INTERROGATORY NO. 5:**

AT&T objects to Interrogatory No. 5 to the extent that it assumes that AT&T had an obligation to block Core traffic and that it seeks information that is irrelevant to the claims and defenses at issue in this litigation. Core already sought to implement revisions to its tariff that would have presumed that traffic that Core sent to AT&T and that AT&T did not block was "legal traffic." *Core Order*, ¶ 40. The FCC found the tariff changes and Core's position to be unreasonable, stating that the FCC has not "create[d] any presumption that calls are legal if the terminating [long distance carrier] does not take action to block them." *Id.*; *see also id.* ¶¶ 41-44. Rather than rely on long distance carriers to block and police impermissible traffic that Core routes to the public telephone network, it is Core's obligation to assess the legitimacy of the 8YY traffic it delivers to AT&T – which would include active policing of Core's traffic to ensure that Core does not route and serve as a gateway for improper traffic to be routed onto the public telephone network. *See Core Order*, ¶¶ 41-44. Further, to the extent that any of Core's traffic was legitimate and represented an actual call from a genuine home or business to an AT&T customer, AT&T could be at risk if it blocked traffic. *Id.* at ¶ 42; *see also, e.g.*, *Establishing Just and Reasonable Rates for Local Exchange Carriers*, 22 FCC Rcd 11629 (2007). AT&T hereafter refers to this objection as the "Blocked Traffic Objection."

AT&T further objects Interrogatory No. 5 to the extent that it assumes that AT&T had or has the burden to take actions to prove to Core that the traffic that Core routed to AT&T was not legitimate. AT&T incorporates by reference its Legitimacy Burden Objection as if set forth fully herein. *See supra* AT&T's Obj. to Interrogatory No. 4.

AT&T further objects to Interrogatory No. 5 on the grounds that it seeks information that is already in the possession of Core.  AT&T further objects to the extent Interrogatory No. 5 seeks information protected by attorney-client privilege and/or attorney work product doctrine.

Subject to and without waiving these objections and its General Objections, AT&T states that from June 1, 2018 to the present, it is AT&T's regular business practice to connect 8YY calls delivered by Core to AT&T's customers that purchase toll-free voice telephony services from AT&T, including RespOrgs (collectively "Customer(s)"). During this time, AT&T has connected all 8YY calls delivered by Core (provided that the calls, which were routed via other providers, were delivered to AT&T's network) to AT&T's external Customers, except where a Customer requested that AT&T not complete calls or in the case of an unexpected congestion event relating to the Public Switched Telephone Network.

**INTERROGATORY NO. 6:**

State whether AT&T maintains a database of any kind and/or a trouble ticket system or software that (in whole or part) tracks complaints from AT&T customers, RespOrgs, and/or carriers regarding 8YY traffic delivered by CoreTel to AT&T (whether through a third party tandem provider or otherwise) and, if so, identify the name (or file name) of the database and/or trouble ticket system or software and the Bates number, if such database has been produced, the total number of complaints that relate to 8YY traffic delivered by CoreTel to AT&T during the period of time from June 1, 2018 to the present, and the date of each complaint.

**RESPONSE TO INTERROGATORY NO. 6:**

AT&T objects to Interrogatory No. 6 to the extent that it seeks information that is irrelevant to the claims and defenses at issue in this litigation.  AT&T incorporates by reference its

11

Legitimacy Burden Objection and Blocked Traffic Objection as if set forth fully herein. *See supra* AT&T's Obj. to Interrogatory Nos. 4 and 5.

Subject to and without waiving these objection and its General Objections, AT&T states that it does not maintain a database or a trouble ticket system or software that (in whole or part) tracks complaints from AT&T customers, RespOrgs, and/or carriers regarding 8YY traffic delivered by Core to AT&T (whether through a third party tandem provider or otherwise).

**INTERROGATORY NO. 7:**

For the period from June 1, 2018 to the present, identify by name and address each and every AT&T customer to whom AT&T delivered 8YY traffic for which the charge number field in the call flow is assigned to a CoreTel OCN.

**RESPONSE TO INTERROGATORY NO. 7:**

AT&T objects to Interrogatory No. 7 on the grounds that it seeks information that is irrelevant to the claims and defenses at issue in this litigation. The information is also unduly burdensome, and not proportional to the needs of the case, considering factors including the importance of the issues at stake in the action and that the burden and expense of the proposed discovery outweighs its likely benefit.

*First*, the identities and addresses of AT&T's Customers are not relevant or proportional to the needs of the case, because this is a collection action case under a tariff for services that Core allegedly provided to AT&T. Under the filed tariff doctrine as well as Core's specific tariffs, nothing about the identity or addresses of AT&T's Customers affects whether Core may or may not collect for invoiced access services. Under the tariff, Core's provision of access service ends once it hands off the call to AT&T, and whether Core can collect (or how much it may collect) is not at all dependent on the identities of AT&T's toll-free Customers.

*Second*, this interrogatory is also unduly burdensome. AT&T has over 50,000 toll-free Customers,[2] and Core's discovery shows that for only a portion of the period in dispute (August 2018 to August 2020), Core routed over 700 million minutes of 8YY calls to AT&T. AT&T does not ordinarily track the traffic it ultimately sends to its toll-free Customers based on the identity of the intermediate carrier or carriers (like Core) that were involved in routing the traffic to AT&T.

To develop such tracking, AT&T would have to create an entirely new mediation and billing process specifically for traffic routed by Core. AT&T, for example, possesses call detail records that have a charge number indicating that a call was sent via Core (specifically, over 700 million minutes), but these records do not identify the 8YY Customer by name/address, the volume of calls to that name/address, or all of the billing information (*e.g.*, rate or rate plan, discount, credit, *etc*.) that AT&T applies to the calls received by that Customer. AT&T has an entirely separate set of billing processes that include information relating to its Customers' identities, call volumes, and billing information, but there is no need for these billing records to identify any intermediate carriers, including Core, and they do not. This means that, in order for AT&T to provide a list of Customers that may have received an 8YY call routed by Core, AT&T would either (1) have to manually map hundreds of millions of its charge number records against its hundreds of millions of billing records or (2) develop an entirely new method whereby some automated system could take one set of the hundreds of millions of charge number records and compare it to the other set of hundreds of millions of billing records. Either effort would be very onerous, and would take very substantial time (*i.e.,* several months) and money. It would therefore be extremely burdensome to compile and provide the identities and addresses of all of the AT&T Customers that may have received an 8YY call routed via Core.

---

[2] AT&T designates the number of its Customers as confidential information pursuant to the Protective Order entered by the Court on April 21, 2022 at Docket No. 45.

Confidential: Subject to Protective Order

*Third*, on two separate occasions before the FCC, Core has unsuccessfully tried to insert provisions in its tariffs that attempted to link Core's collection of access charges to AT&T's relationship and charges to its retail customers.  *See Core Order,* ¶¶ 26-28, 45-51; *see also* Core Direct Case at 2, 37-38.  In both instances, the FCC flatly rejected Core's efforts to "regulate [AT&T's] relationship with its toll-free customers."  *In the Matter of Core Communications, Inc., et al. Tariff F.C.C. No. 3,* DA 21-1515, WCB/Pricing File No. 21-02, ¶ 14 ("*Second Core Order*"); *see also Core Order*, ¶ 28 ("Core's customer is the IXC, not the IXC's 8YY customer," and the "purpose of [Core's] tariff is to provide the rates, terms, and conditions that govern a carrier's (Core's) relationship with its customers (IXCs), not to impose the carrier's will on its customer's end-user customer.").

In these circumstances, and in light of AT&T's other responses to discovery, as well as its offer to enter into a written stipulation as to certain facts as to its delivery of traffic from Core to its Customers (and the charges and/or credits for such traffic), a full response to this Interrogatory is not relevant, is overly burdensome, and is not proportional to the needs of the case.  Because AT&T has already responded that it generally did not block calls, and that it typically billed its Customers for the traffic Core routed, while providing credits or refunds in some cases, further and burdensome discovery as to the names and addresses of all of AT&T's toll-free Customers that received Core traffic, the volumes of calls received, and the amounts billed and/or credited is unnecessary, would be burdensome, and would take the parties and the Court into wholly collateral disputes.  *See Fenter v. Kraft Foods Global, Inc.*, 2012 WL 12903810, at *1 (E.D. Pa. 2012) (declining to enforce interrogatories that were overbroad, unduly burdensome, and irrelevant).

AT&T incorporates by reference its Legitimacy Burden Objection as if set forth fully herein.  *See supra* AT&T's Obj. to Interrogatory No. 4.  AT&T further objects to Interrogatory

No. 7 as duplicative of First Interrogatory No. 14, which requested that AT&T "identify all entities to whom AT&T delivered telecommunications traffic that was originally delivered from Core to AT&T."

Subject to and without waiving these objections and its General Objections, AT&T will not respond to this Interrogatory other than with the foregoing objections.

**INTERROGATORY NO. 8:**

For each AT&T customer identified in response to Interrogatory No. 7, state the total volume of 8YY traffic (in minutes of use) AT&T delivered to the customer in each month since June 1, 2018 for which the charge number field in the call flow is assigned to a CoreTel OCN.

**RESPONSE TO INTERROGATORY NO. 8:**

AT&T objects to Interrogatory No. 8 on the grounds that it exceeds the 25 interrogatory limit set by Rule 33 of the Federal Rules of Civil Procedure, including discrete subparts. Core propounded 18 interrogatories in its First Interrogatories on AT&T, and purports to propound an additional 14 interrogatories on AT&T through these Interrogatories, for a total of 32 interrogatories, not including discrete subparts. AT&T notes that Core appears to attempt to avoid the 25 interrogatory limit by serving its First Interrogatories on behalf of "Core Communications, Inc." and serving these Interrogatories on behalf of "CoreTel Delaware, Inc." AT&T objects to this as impermissible and prejudicial. Core does not differentiate between Core Communications, Inc. and CoreTel Delaware, Inc. (or any of the other Plaintiffs) in its complaint; instead, Plaintiffs brings their case in unison against AT&T—all causes of action against AT&T are brought collectively by all Plaintiffs. All Plaintiffs are represented by the same attorneys. Core's First Interrogatories served by "Core Communications, Inc." do not focus on issues specific to Core Communications, Inc., and these Interrogatories served by "CoreTel Delaware, Inc." do not focus

on issues specific to CoreTel Delaware, Inc.  Instead, both the First Interrogatories and these Interrogatories seek information from AT&T related to Core generally.  Indeed, Core has served all other discovery in this action (two rounds of requests for production and one set of request for admission) on behalf of all Plaintiffs.  Plaintiffs in this action are therefore nominally separate. Courts hold that such nominally separate parties cannot avoid the 25 interrogatory limit set by the Federal Rules of Civil Procedure by serving interrogatories in the way in which Core does so here. *See, e.g., Stiles v. Walmart, Inc.*, No. 2:14-CV-2234-MCE-DMC, 2020 WL 264420, at *1, *4-5 (E.D. Cal. Jan. 17, 2020); *Am. Council of the Blind of Metropolitan Chicago v. City of Chicago*, No. 19 C 6322, 2021 WL 5140475, at *1 (N.D. Ill. Nov. 4, 2021).  AT&T hereafter refers to this objection as the "Interrogatory Limit Objection."

AT&T further objects to Interrogatory No. 8 on the grounds that it seeks information that is irrelevant to the claims and defenses at issue in this litigation.  The information is also unduly burdensome, and not proportional to the needs of the case, considering factors including the importance of the issues at stake in the action and that the burden and expense of the proposed discovery outweighs its likely benefit.

*First*, the total volume of 8YY traffic (in minutes of use) routed via Core that AT&T delivered to its Customers is not relevant or proportional to the needs of the case, because this is a collection action case under a tariff for services that Core allegedly provided to AT&T.  Under the filed tariff doctrine as well as Core's specific tariffs, nothing about the volume of Core traffic delivered to AT&T's Customers affects whether Core may or may not collect for invoiced access services.  Under the tariff, Core's provision of access service ends once it hands off the call to AT&T, and whether Core can collect (or how much it may collect) is not at all dependent on the volume of Core's traffic ultimately delivered to AT&T's Customers.

*Second*, this interrogatory is also unduly burdensome.  AT&T has over 50,000 toll-free Customers, and Core's discovery shows that for only a portion of the period in dispute (August 2018 to August 2020), Core routed over 700 million minutes of 8YY calls to AT&T. AT&T does not ordinarily track the volumes of traffic it ultimately sends to its toll-free Customers based on the identity of the intermediate carrier or carriers (like Core) that were involved in routing the traffic to AT&T.

To develop such tracking, AT&T would have to create an entirely new mediation and billing process specifically for traffic routed by Core.  AT&T, for example, possesses call detail records that have a charge number indicating that a call was sent via Core (specifically, over 700 million minutes), but these records do not identify the 8YY Customer by name/address, the volume of calls to that name/address, or all of the billing information (*e.g.*, rate or rate plan, discount, credit, *etc.*) that AT&T applies to the calls received by that Customer.  AT&T has an entirely separate set of billing processes that include information relating to its Customers' identities, call volumes, and billing information, but there is no need for these billing records to identify any intermediate carriers, including Core, and they do not. This means that, in order for AT&T to provide the volume of calls for each of its of Customers (which number to at least tens of thousands of entities) that have received an 8YY call routed by Core, AT&T would either (1) have to manually map hundreds of millions of its charge number records against its hundreds of millions of billing records or (2) develop an entirely new method whereby some automated system could take one set of the hundreds of millions of charge number records and compare it to the other set of hundreds of millions of billing records.  Either effort would be very onerous, and would take very substantial time (*i.e.,* several months) and money.   It would therefore be extremely

Confidential: Subject to Protective Order

burdensome to compile and provide the volume of Core traffic that AT&T Customers may have received.

     *Third*, on two separate occasions before the FCC, Core has unsuccessfully tried to insert provisions in its tariffs that attempted to link Core's collection of access charges to AT&T's relationship and charges to its retail customers.  *See Core Order,* ¶¶ 26-28, 45-51; *see also* Core Direct Case at 2, 37-38.  In both instances, the FCC flatly rejected Core's efforts to "regulate [AT&T's] relationship with its toll-free customers."  *Second Core Order*, ¶ 14; *see also Core Order*, ¶ 28 ("Core's customer is the IXC, not the IXC's 8YY customer," and the "purpose of [Core's] tariff is to provide the rates, terms, and conditions that govern a carrier's (Core's) relationship with its customers (IXCs), not to impose the carrier's will on its customer's end-user customer.").

     In these circumstances, and in light of AT&T's other responses to discovery, as well as its offer to enter into a written stipulation as to certain facts as to its delivery of traffic from Core to its Customers (and the charges and/or credits for such traffic), a full response to this Interrogatory is not relevant, is overly burdensome, and is not proportional to the needs of the case.  Because AT&T has already responded that it generally did not block calls, and that it typically billed its Customers for the traffic Core routed, while providing credits or refunds in some cases, further and burdensome discovery as to the names and addresses of all of AT&T's toll-free Customers that received Core traffic, the volumes of calls received, and the amounts billed and/or credited is unnecessary, would be burdensome, and would take the parties and the Court into wholly collateral disputes.  *See Fenter,* 2012 WL 12903810, at *1.

     AT&T incorporates by reference its Legitimacy Burden Objection as if set forth fully herein.  *See supra* AT&T's Obj. to Interrogatory No. 4.  AT&T further objects to Interrogatory

No. 8 as duplicative of First Interrogatory No. 12, which requested that AT&T "state the total volume of telecommunications traffic that AT&T delivered to each entity [listed on Exhibit B] since July 2017 for which the charge number in the call flow is populated with an NPA-NXX assigned to Core OCNs."

Subject to and without waiving these objections and its General Objections, AT&T will not respond to this Interrogatory other than with the foregoing objections.

**INTERROGATORY NO. 9:**

For each AT&T customer identified in response to Interrogatory No. 7, state whether the customer at any time from June 1, 2018 to the present made any complaint(s) to AT&T relating to 8YY traffic delivered by CoreTel to AT&T (whether through a third party tandem provider or otherwise) and, if a complaint was made, identify the date of each complaint, the name of the person(s) making each complaint, and the method by which each complaint was transmitted to AT&T (i.e., by email, trouble ticket, phone, etc.).

**RESPONSE TO INTERROGATORY NO. 9:**

AT&T objects to Interrogatory No. 9 on the grounds that it exceeds the 25 interrogatory limit set by Rule 33 of the Federal Rules of Civil Procedure, including discrete subparts.  AT&T incorporates by reference its Interrogatory Limit Objection as if set forth fully herein.  *See supra* AT&T's Obj. to Interrogatory No. 8.

AT&T further objects to Interrogatory No. 9 on the grounds that it seeks information that is irrelevant to the claims and defenses at issue in this litigation, and incorporates by reference its Legitimacy Burden Objection and its Blocked Traffic Objection as if set forth fully herein.  *See supra* AT&T's Obj. to Interrogatory Nos. 4 and 5.

AT&T further objects to Interrogatory No. 9 on the grounds that it is unduly burdensome, and not proportional to the needs of the case, considering factors including the importance of the issues at stake in the action and that the burden and expense of the proposed discovery outweighs its likely benefit.  AT&T has over 50,000 toll-free Customers, and Core's discovery shows that for only a portion of the period in dispute (August 2018 to August 2020), Core routed over 700 million minutes of 8YY calls to AT&T.  AT&T's Customer complaints have no information about the identity of the carrier or carriers that were involved in routing the traffic to AT&T (*e.g.*, the Customer has no insight into what carrier routed the traffic to AT&T).  There is, accordingly, no way for AT&T to search its records relating to Customer complaints for complaints specifically related to traffic routed to AT&T by any intermediate carrier, including Core.  On certain occasions, AT&T has performed manual investigations of suspect traffic, and uncovered instances where Customer complaints involve Core traffic, *see e.g.,* AT&T's Resp. to First Interrogatory 16, and AT&T has performed a reasonable search for and produced documents relating to such complaints in its June 22, 2022 document production.  However, it would be extremely burdensome for AT&T to perform that kind of manual investigation for every single complaint AT&T has received from its toll-free Customers during the relevant time period to attempt to determine which complaints relate to Core traffic.

AT&T further objects to Interrogatory No. 9 on the grounds that it seeks information that is already in the possession of Core; specifically, documents produced by AT&T in its June 22, 2022 production.

Subject to and without waiving these objections and its General Objections, AT&T will not respond to this Interrogatory other than with the foregoing objections.

Confidential: Subject to Protective Order

**INTERROGATORY NO. 10:**

For each AT&T customer identified in response to Interrogatory No. 7, state whether AT&T at any time from June 1, 2018 to the present has provided the customer with a refund, credit or invoice reduction relating to 8YY traffic delivered by CoreTel to AT&T (whether through a third party tandem provider or otherwise) and, if a refund, credit or invoice reduction was made to the customer, identify: the date of each refund, credit, or invoice reduction; the amount of each refund, credit, or invoice reduction; and the reason for each refund, credit, or invoice reduction.

**RESPONSE TO INTERROGATORY NO. 10:**

AT&T objects to Interrogatory No. 10 on the grounds that it exceeds the 25 interrogatory limit set by Rule 33 of the Federal Rules of Civil Procedure, including discrete subparts.  AT&T incorporates by reference its Interrogatory Limit Objection as if set forth fully herein.  *See supra* AT&T's Obj. to Interrogatory No. 8.

AT&T further objects to Interrogatory No. 10 on the grounds that it seeks information that is irrelevant to the claims and defenses at issue in this litigation.  The information is also unduly burdensome, and not proportional to the needs of the case, considering factors including the importance of the issues at stake in the action and that the burden and expense of the proposed discovery outweighs its likely benefit.

*First*, whether AT&T provided its Customers with refunds, credits, or invoice reductions related to 8YY traffic delivered by Core to AT&T (and the amounts of any such refunds, credits, or invoice reductions) is not relevant or proportional to the needs of the case, because this is a collection action case under a tariff for services that Core allegedly provided to AT&T.  Under the filed tariff doctrine as well as Core's specific tariffs, nothing about refunds, credits, or invoice reductions provided by AT&T to its Customers related to 8YY traffic delivered by Core affects

21

whether Core may or may not collect for invoiced access services. Under the tariff, Core's provision of access service ends once it hands off the call to AT&T, and whether Core can collect (or how much it may collect) is not at all dependent on whether AT&T provided its Customers with any refunds, credits, or invoice reductions related to Core's traffic.

*Second*, this interrogatory is also unduly burdensome. AT&T has over 50,000 toll-free Customers, and Core's discovery shows that for only a portion of the period in dispute (August 2018 to August 2020), Core routed over 700 million minutes of 8YY calls to AT&T. AT&T's Customer complaints have no information about the identity of the carrier or carriers that were involved in routing the traffic to AT&T (*e.g.*, the Customer has no insight into what carrier routed the traffic to AT&T). There is, accordingly, no way for AT&T to search its records relating to Customer complaints for complaints specifically related to traffic routed to AT&T by any intermediate carrier, including Core, and any billing adjustment made based on that complaint (via refund, credit, invoice reduction, or otherwise) is similarly not traceable to the intermediate carrier. On certain occasions, AT&T has performed manual investigations of suspect traffic, and uncovered instances where Customer complaints involve Core traffic, *see e.g.*, AT&T's Resp. to First Interrogatory 16, and AT&T has, on occasion, provided its Customers with credits, refunds, or invoice reductions related to Core's traffic. However, it would be extremely burdensome for AT&T to perform that kind of manual investigation for every single complaint AT&T has received from its toll-free Customers during the relevant time period to attempt to determine which complaints relate to Core traffic, and then to further investigate whether a credit, refund, or invoice reduction was provided to that Customer based on that complaint.

*Third,* on two separate occasions before the FCC, Core has unsuccessfully tried to insert provisions in its tariffs that attempted to link Core's collection of access charges to AT&T's

Confidential: Subject to Protective Order

relationship and charges to its retail customers.  *See Core Order,* ¶¶ 26-28, 45-51; *see also* Core Direct Case at 2, 37-38.  In both instances, the FCC flatly rejected Core's efforts to "regulate [AT&T's] relationship with its toll-free customers."  *Second Core Order*, ¶ 14; *see also Core Order*, ¶ 28 ("Core's customer is the IXC, not the IXC's 8YY customer," and the "purpose of [Core's] tariff is to provide the rates, terms, and conditions that govern a carrier's (Core's) relationship with its customers (IXCs), not to impose the carrier's will on its customer's end-user customer.").

In these circumstances, and in light of AT&T's other responses to discovery, as well as its offer to enter into a written stipulation as to certain facts as to its delivery of traffic from Core to its Customers (and the charges and/or credits for such traffic), a full response to this Interrogatory is not relevant, is overly burdensome, and is not proportional to the needs of the case.  Because AT&T has already responded that it generally did not block calls, and that it typically billed its Customers for the traffic Core routed, while providing credits or refunds in some cases, further and burdensome discovery as to the names and addresses of all of AT&T's toll-free Customers that received Core traffic, the volumes of calls received, and the amounts billed and/or credited is unnecessary, would be burdensome, and would take the parties and the Court into wholly collateral disputes.  *See Fenter,* 2012 WL 12903810, at *1.

AT&T incorporates by reference its Legitimacy Burden Objection as if set forth fully herein.  *See supra* AT&T's Obj. to Interrogatory No. 4.

Subject to and without waiving these objections and its General Objections, AT&T will not respond to this Interrogatory other than with the foregoing objections.

**INTERROGATORY NO. 11:**

For the period from June 1, 2018 to the present, identify by name all RespOrgs to whom AT&T delivered 8YY traffic for which the charge number field in the call flow is assigned to a CoreTel OCN.

**RESPONSE TO INTERROGATORY NO. 11:**

AT&T objects to Interrogatory No. 11 on the grounds that it exceeds the 25 interrogatory limit set by Rule 33 of the Federal Rules of Civil Procedure, including discrete subparts.  AT&T incorporates by reference its Interrogatory Limit Objection as if set forth fully herein.  *See supra* AT&T's Obj. to Interrogatory No. 8.  AT&T further objects to Interrogatory No. 11 as duplicative of First Interrogatory 14, which requested that AT&T "identify all entities to whom AT&T delivered telecommunications traffic that was originally delivered from Core to AT&T."  AT&T further objects to Interrogatory No. 11 to the extent it is duplicative of Interrogatory No. 7.

AT&T further objects to Interrogatory No. 11 on the grounds that it seeks information that is irrelevant to the claims and defenses at issue in this litigation.  The information is also unduly burdensome, and not proportional to the needs of the case, considering factors including the importance of the issues at stake in the action and that the burden and expense of the proposed discovery outweighs its likely benefit.

*First*, the identities and addresses of Customers to whom AT&T delivered 8YY traffic are not relevant or proportional to the needs of the case, because this is a collection action case under a tariff for services that Core allegedly provided to AT&T.  Under the filed tariff doctrine as well as Core's specific tariffs, nothing about the identity or addresses of AT&T's Customers affects whether Core may or may not collect for invoiced access services.  Under the tariff, Core's

provision of access service ends once it hands off the call to AT&T, and whether Core can collect (or how much it may collect) is not at all dependent on the identities of these Customers.

*Second*, this interrogatory is also unduly burdensome. AT&T has over 50,000 toll-free Customers, and Core's discovery shows that for only a portion of the period in dispute (August 2018 to August 2020), Core routed over 700 million minutes of 8YY calls to AT&T. AT&T does not ordinarily track the traffic it ultimately sends to its toll-free Customers based on the identity of the intermediate carrier or carriers (like Core) that were involved in routing the traffic to AT&T.

To develop such tracking, AT&T would have to create an entirely new mediation and billing process specifically for traffic routed by Core. AT&T, for example, possesses call detail records that have a charge number indicating that a call was sent via Core (specifically, over 700 million minutes), but these records do not identify the 8YY Customers by name/address, the volume of calls to that name/address, or all of the billing information (*e.g.*, rate or rate plan, discount, credit, *etc.*) that AT&T applies to the calls received by that Customers. AT&T has an entirely separate set of billing processes that include information relating to its Customers' identities, call volumes, and billing information, but there is no need for these billing records to identify any intermediate carriers, including Core, and they do not. This means that, in order for AT&T to provide a list of Customers that may have received an 8YY call routed by Core, AT&T would either (1) have to manually map hundreds of millions of its charge number records against its hundreds of millions of billing records or (2) develop an entirely new method whereby some automated system could take one set of the hundreds of millions of charge number records and compare it to the other set of hundreds of millions of billing records. Either effort would be very onerous, and would take very substantial time (*i.e.,* several months) and money. It would therefore

Confidential: Subject to Protective Order

be extremely burdensome to compile and provide the identities and addresses of all of the AT&T Customers that may have received an 8YY call routed via Core.

*Third*, on two separate occasions before the FCC, Core has unsuccessfully tried to insert provisions in its tariffs that attempted to link Core's collection of access charges to AT&T's relationship and charges to its retail customers.  *See Core Order,* ¶¶ 26-28, 45-51; *see also* Core Direct Case at 2, 37-38.  In both instances, the FCC flatly rejected Core's efforts to "regulate [AT&T's] relationship with its toll-free customers."  *Second Core Order*, ¶ 14; *see also Core Order*, ¶ 28 ("Core's customer is the IXC, not the IXC's 8YY customer," and the "purpose of [Core's] tariff is to provide the rates, terms, and conditions that govern a carrier's (Core's) relationship with its customers (IXCs), not to impose the carrier's will on its customer's end-user customer.").

In these circumstances, and in light of AT&T's other responses to discovery, as well as its offer to enter into a written stipulation as to certain facts as to its delivery of traffic from Core to its Customers (and the charges and/or credits for such traffic), a full response to this Interrogatory is not relevant, is overly burdensome, and is not proportional to the needs of the case.  Because AT&T has already responded that it generally did not block calls, and that it typically billed its Customers for the traffic Core routed, while providing credits or refunds in some cases, further and burdensome discovery as to the names and addresses of all of AT&T's toll-free Customers that received Core traffic, the volumes of calls received, and the amounts billed and/or credited is unnecessary, would be burdensome, and would take the parties and the Court into wholly collateral disputes.  *See Fenter,* 2012 WL 12903810, at *1.

AT&T incorporates by reference its Legitimacy Burden Objection as if set forth fully herein.  *See supra* AT&T's Obj. to Interrogatory No. 4.  AT&T further objects to this Interrogatory

on the grounds that the identity of Customers for particular 8YY numbers is publicly available information.

Subject to and without waiving these objections and its General Objections, AT&T will not respond to this Interrogatory other than with the foregoing objections.

**INTERROGATORY NO. 12:**

For each RespOrg identified in response to Interrogatory No. 11, state the total volume of 8YY traffic (in minutes of use) AT&T delivered to the RespOrg in each month since June 1, 2018 for which the charge number field in the call flow is assigned to a CoreTel OCN.

**RESPONSE TO INTERROGATORY NO. 12:**

AT&T objects to Interrogatory No. 12 on the grounds that it exceeds the 25 interrogatory limit set by Rule 33 of the Federal Rules of Civil Procedure, including discrete subparts. AT&T incorporates by reference its Interrogatory Limit Objection as if set forth fully herein. *See supra* AT&T's Obj. to Interrogatory No. 8. AT&T further objects to Interrogatory No. 12 as duplicative of First Interrogatory No. 12, which requested that AT&T state "the total volume of telecommunications traffic that AT&T delivered to each entity [listed on Exhibit B] since July 2017 for which the charge number in the call flow is populated with an NPA-NXX assigned to Core OCNs." AT&T further objects to Interrogatory No. 12 to the extent it is duplicative of Interrogatory No. 8.

AT&T further objects to Interrogatory No. 12 on the grounds that it seeks information that is irrelevant to the claims and defenses at issue in this litigation. The information is also unduly burdensome, and not proportional to the needs of the case, considering factors including the importance of the issues at stake in the action and that the burden and expense of the proposed discovery outweighs its likely benefit.

*First*, the total volume of 8YY traffic (in minutes of use) routed via Core that AT&T delivered to its Customers is not relevant or proportional to the needs of the case, because this is a collection action case under a tariff for services that Core allegedly provided to AT&T.  Under the filed tariff doctrine as well as Core's specific tariffs, nothing about the volume of Core volume delivered to AT&T's Customers affects whether Core may or may not collect for invoiced access services.  Under the tariff, Core's provision of access service ends once it hands off the call to AT&T, and whether Core can collect (or how much it may collect) is not at all dependent on the volume of Core's traffic delivered to AT&T's Customers.

*Second*, this interrogatory is also unduly burdensome.  AT&T has over 50,000 toll-free Customers, and Core's discovery shows that for only a portion of the period in dispute (August 2018 to August 2020), Core routed over 700 million minutes of 8YY calls to AT&T. AT&T does not ordinarily track the volumes of traffic it ultimately sends to its toll-free Customers based on the identity of the intermediate carrier or carriers (like Core) that were involved in routing the traffic to AT&T.

To develop such tracking, AT&T would have to create an entirely new mediation and billing process specifically for traffic routed by Core.  AT&T, for example, possesses call detail records that have a charge number indicating that a call was sent via Core (specifically, over 700 million minutes), but these records do not identify the 8YY Customers by name/address, the volume of calls to that name/address, or all of the billing information (*e.g.*, rate or rate plan, discount, credit, *etc.*) that AT&T applies to the calls received by that Customers.  AT&T has an entirely separate set of billing processes that include information relating to its Customers' identities, call volumes, and billing information, but there is no need for these billing records to identify any intermediate carriers, including Core, and they do not. This means that, in order for

Confidential: Subject to Protective Order

AT&T to provide the volume of calls for each of its of Customers (which number to at least tens of thousands of entities) that have received an 8YY call routed by Core, AT&T would either (1) have to manually map hundreds of millions of its charge number records against its hundreds of millions of billing records or (2) develop an entirely new method whereby some automated system could take one set of the hundreds of millions of charge number records and compare it to the other set of hundreds of millions of billing records.  Either effort would be very onerous, and would take very substantial time (*i.e.,* several months) and money.   It would therefore be extremely burdensome to compile and provide the volume of Core traffic that AT&T Customers may have received.

*Third*, on two separate occasions before the FCC, Core has unsuccessfully tried to insert provisions in its tariffs that attempted to link Core's collection of access charges to AT&T's relationship and charges to its retail customers.  *See Core Order,* ¶¶ 26-28, 45-51; *see also* Core Direct Case at 2, 37-38.  In both instances, the FCC flatly rejected Core's efforts to "regulate [AT&T's] relationship with its toll-free customers."  *Second Core Order*, ¶ 14; *see also Core Order*, ¶ 28 ("Core's customer is the IXC, not the IXC's 8YY customer," and the "purpose of [Core's] tariff is to provide the rates, terms, and conditions that govern a carrier's (Core's) relationship with its customers (IXCs), not to impose the carrier's will on its customer's end-user customer.").

In these circumstances, and in light of AT&T's other responses to discovery, as well as its offer to enter into a written stipulation as to certain facts as to its delivery of traffic from Core to its Customers (and the charges and/or credits for such traffic), a full response to this Interrogatory is not relevant, is overly burdensome, and is not proportional to the needs of the case.  Because AT&T has already responded that it generally did not block calls, and that it typically billed its

Customers for the traffic Core routed, while providing credits or refunds in some cases, further and burdensome discovery as to the names and addresses of all of AT&T's toll-free Customers that received Core traffic, the volumes of calls received, and the amounts billed and/or credited is unnecessary, would be burdensome, and would take the parties and the Court into wholly collateral disputes. *See Fenter,* 2012 WL 12903810, at \*1.

AT&T incorporates by reference its Legitimacy Burden Objection as if set forth fully herein. *See supra* AT&T's Obj. to Interrogatory No. 4.

Subject to and without waiving these objections and its General Objections, AT&T will not respond to this Interrogatory other than with the foregoing objections.

**INTERROGATORY NO. 13:**

For each RespOrg identified in response to Interrogatory No. 11, state whether the RespOrg at any time from June 1, 2018 to the present made any complaint(s) to AT&T relating to 8YY traffic delivered by CoreTel to AT&T (whether through a third party tandem provider or otherwise) and, if a complaint was made, identify the date of each complaint, the name of the person(s) making each complaint, and the method by which each complaint was transmitted to AT&T (i.e., by email, trouble ticket, phone, etc.).

**RESPONSE TO INTERROGATORY NO. 13:**

AT&T objects to Interrogatory No. 13 on the grounds that it exceeds the 25 interrogatory limit set by Rule 33 of the Federal Rules of Civil Procedure, including discrete subparts. AT&T incorporates by reference its Interrogatory Limit Objection as if set forth fully herein. *See supra* AT&T's Obj. to Interrogatory No. 8. AT&T further objects to Interrogatory No. 13 to the extent it is duplicative of Interrogatory No. 9.

AT&T further objects to Interrogatory No. 13 on the grounds that it seeks information that is irrelevant to the claims and defenses at issue in this litigation, and incorporates by reference its Legitimacy Burden Objection and its Blocked Traffic Objection as if set forth fully herein.  *See supra* AT&T's Obj. to Interrogatory Nos. 4 and 5.

AT&T further objects to Interrogatory No. 9 on the grounds that it is unduly burdensome, and not proportional to the needs of the case, considering factors including the importance of the issues at stake in the action and that the burden and expense of the proposed discovery outweighs its likely benefit.  AT&T has over 50,000 toll-free Customers, and Core's discovery shows that for only a portion of the period in dispute (August 2018 to August 2020), Core routed over 700 million minutes of 8YY calls to AT&T.  AT&T's Customer complaints have no information about the identity of the carrier or carriers that were involved in routing the traffic to AT&T (*e.g.*, the Customer has no insight into what carrier routed the traffic to AT&T).  There is, accordingly, no way for AT&T to search its records relating to Customer complaints for complaints specifically related to traffic routed to AT&T by any intermediate carrier, including Core.  On certain occasions, AT&T has performed manual investigations of suspect traffic, and uncovered instances where Customer complaints involve Core traffic, *see e.g.,* AT&T's Resp. to First Interrogatory 16, and AT&T has performed a reasonable search for and produced documents relating to such complaints in its June 22, 2022 document production.  However, it would be extremely burdensome for AT&T to perform that kind of manual investigation for every single complaint AT&T has received from its toll-free Customers during the relevant time period to attempt to determine which complaints relate to Core traffic.

AT&T further objects to Interrogatory No. 13 on the grounds that it seeks information that is already in the possession of Core.

Confidential: Subject to Protective Order

Subject to and without waiving these objections and its General Objections, AT&T will not respond to this Interrogatory other than with the foregoing objections.

**INTERROGATORY NO. 14:**

For each RespOrg identified in response to Interrogatory No. 11, state whether AT&T at any time from June 1, 2018 to the present has provided the RespOrg with a refund, credit or invoice reduction relating to 8YY traffic delivered by CoreTel to AT&T (whether through a third party tandem provider or otherwise) and, if a refund, credit or invoice reduction was made to the RespOrg, identify: the date of each refund, credit, or invoice reduction; the amount of each refund, credit, or invoice reduction; and the reason for each refund, credit, or invoice reduction.

**RESPONSE TO INTERROGATORY NO. 14:**

AT&T objects to Interrogatory No. 14 on the grounds that it exceeds the 25 interrogatory limit set by Rule 33 of the Federal Rules of Civil Procedure, including discrete subparts. AT&T incorporates by reference its Interrogatory Limit Objection as if set forth fully herein. *See supra* AT&T's Obj. to Interrogatory No. 8. AT&T further objects to Interrogatory No. 14 to the extent it is duplicative of Interrogatory No. 10.

AT&T further objects to Interrogatory No. 14 on the grounds that it seeks information that is irrelevant to the claims and defenses at issue in this litigation. The information is also unduly burdensome, and not proportional to the needs of the case, considering factors including the importance of the issues at stake in the action and that the burden and expense of the proposed discovery outweighs its likely benefit.

*First*, whether AT&T provided its Customers with refunds, credits, or invoice reductions related to 8YY traffic delivered by Core to AT&T (and the amounts of any such refunds, credits, or invoice reductions) is not relevant or proportional to the needs of the case, because this is a

collection action case under a tariff for services that Core allegedly provided to AT&T.  Under the filed tariff doctrine as well as Core's specific tariffs, nothing about refunds, credits, or invoice reductions provided by AT&T to its Customers related to 8YY traffic delivered by Core affects whether Core may or may not collect for invoiced access services.  Under the tariff, Core's provision of access service ends once it hands off the call to AT&T, and whether Core can collect (or how much it may collect) is not at all dependent on whether AT&T provided its Customers with any refunds, credits, or invoice reductions related to Core's traffic.

*Second*, this interrogatory is also unduly burdensome.  AT&T has over 50,000 toll-free Customers, and Core's discovery shows that for only a portion of the period in dispute (August 2018 to August 2020), Core routed over 700 million minutes of 8YY calls to AT&T.  AT&T's Customer complaints have no information about the identity of the carrier or carriers that were involved in routing the traffic to AT&T (e.g., the Customer has no insight into what carrier routed the traffic to AT&T).  There is, accordingly, no way for AT&T to search its records relating to Customer complaints for complaints specifically related to traffic routed to AT&T by any intermediate carrier, including Core, and any billing adjustment made based on that complaint (via refund, credit, invoice reduction, or otherwise) is similarly not traceable to the intermediate carrier.  On certain occasions, AT&T has performed manual investigations of suspect traffic, and uncovered instances where Customer complaints involve Core traffic, *see e.g.,* AT&T's Resp. to First Interrogatory 16, and AT&T has, on occasion, provided its Customers with credits, refunds, or invoice reductions related to Core's traffic.  However, it would be extremely burdensome for AT&T to perform that kind of manual investigation for every single complaint AT&T has received from its toll-free Customers during the relevant time period to attempt to determine which

33

complaints relate to Core traffic, and then to further investigate whether a credit, refund, or invoice reduction was provided to that Customer based on that complaint.

*Third,* on two separate occasions before the FCC, Core has unsuccessfully tried to insert provisions in its tariffs that attempted to link Core's collection of access charges to AT&T's relationship and charges to its retail customers.  *See Core Order,* ¶¶ 26-28, 45-51; *see also* Core Direct Case at 2, 37-38.  In both instances, the FCC flatly rejected Core's efforts to "regulate [AT&T's] relationship with its toll-free customers."  *Second Core Order*, ¶ 14; *see also Core Order*, ¶ 28 ("Core's customer is the IXC, not the IXC's 8YY customer," and the "purpose of [Core's] tariff is to provide the rates, terms, and conditions that govern a carrier's (Core's) relationship with its customers (IXCs), not to impose the carrier's will on its customer's end-user customer.").

In these circumstances, and in light of AT&T's other responses to discovery, as well as its offer to enter into a written stipulation as to certain facts as to its delivery of traffic from Core to its Customers (and the charges and/or credits for such traffic), a full response to this Interrogatory is not relevant, is overly burdensome, and is not proportional to the needs of the case.  Because AT&T has already responded that it generally did not block calls, and that it typically billed its Customers for the traffic Core routed, while providing credits or refunds in some cases, further and burdensome discovery as to the names and addresses of all of AT&T's toll-free Customers that received Core traffic, the volumes of calls received, and the amounts billed and/or credited is unnecessary, would be burdensome, and would take the parties and the Court into wholly collateral disputes.  *See Fenter,* 2012 WL 12903810, at *1.

AT&T incorporates by reference its Legitimacy Burden Objection as if set forth fully herein.  *See supra* AT&T's Obj. to Interrogatory No. 4.

34

Subject to and without waiving these objections and its General Objections, AT&T will not respond to this Interrogatory other than with the foregoing objections.

Dated: October 20, 2022                    Respectfully submitted,

                                        _/s/ Angela C. Zambrano_
                                        Angela C. Zambrano (admitted *pro hac vice*)
                                        angela.zambrano@sidley.com
                                        Deepika R. Daggubati (admitted *pro hac vice*)
                                        ddaggubati@sidley.com
                                        SIDLEY AUSTIN LLP
                                        2021 McKinney Ave., Suite 2000
                                        Dallas, TX 75201
                                        Tel:  214.981.3300
                                        Fax:  214.981.3400

                                        Justin A. Benson (admitted *pro hac vice*)
                                        jbenson@sidley.com
                                        SIDLEY AUSTIN LLP
                                        1501 K ST NW
                                        Washington, DC 20005
                                        Tel: 202.736.8757
                                        Fax: 202.736.8711

                                        John P. Morgenstern
                                        JMorgenstern@ohaganmeyer.com
                                        O'HAGAN MEYER, PLLC
                                        1717 Arch Street, Suite 3910
                                        Philadelphia, PA 19103
                                        Tel:  215.461.3301
                                        Fax:  215.461.3311

                                        *Attorneys for Defendant AT&T Corp.*

## VERIFICATION

I, ARDELL BURGESS, state as follows:

I am Director Sourcing Operations, Global Connections Management for AT&T Corp. ("AT&T"), the Defendant in this action.  I have read AT&T's Objections and Written Responses to Plaintiffs' Second Set of Interrogatories ("AT&T's Responses"), specifically AT&T's Responses to Interrogatory Nos. 1, 2, 3, 4, and 6 and am authorized to execute this verification on its behalf with respect to these Responses.  The information contained in AT&T's Responses to Interrogatory Nos. 1, 2, 3, 4, and 6 is true to the best of my knowledge, information, and belief.  As to those matters that are not within my personal knowledge, they are based upon information from persons with knowledge and from the records, correspondence, and other information within the possession of AT&T.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at _Bedminster, NJ_ on this **20** day of October 2022.

ARDELL BURGESS

## **VERIFICATION**

I, ADAM PANAGIA, state as follows:

I am the Global Fraud Management Director for AT&T Corp. ("AT&T"), the Defendant in this action.  I have read AT&T's Objections and Written Responses to Plaintiffs' Second Set of Interrogatories ("AT&T's Responses"), specifically AT&T's Responses to Interrogatory Nos. 5 and 7 through 14, and am authorized to execute this verification on its behalf with respect to these Responses.  The information contained in AT&T's Responses to Interrogatory Nos. 5 and 7 through 14 is true to the best of my knowledge, information, and belief.  As to those matters that are not within my personal knowledge, they are based upon information from persons with knowledge and from the records, correspondence, and other information within the possession of AT&T.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at _Bedminster, New Jersey_ on this _20th_ day of October 2022.

_____
ADAM PANAGIA

# EXHIBIT  1

| Begin Bates | End Bates |
|---|---|
| ATT0004191 | ATT0004192 |
| ATT0005125 | ATT0005126 |
| ATT0005127 | ATT0005127 |
| ATT0005406 | ATT0005407 |
| ATT0005762 | ATT0005765 |
| ATT0005803 | ATT0005805 |
| ATT0005806 | ATT0005808 |
| ATT0005809 | ATT0005811 |
| ATT0005812 | ATT0005813 |
| ATT0005814 | ATT0005815 |
| ATT0005816 | ATT0005816 |
| ATT0005817 | ATT0005817 |
| ATT0005818 | ATT0005818 |
| ATT0005819 | ATT0005820 |
| ATT0005821 | ATT0005821 |
| ATT0005822 | ATT0005823 |
| ATT0005824 | ATT0005824 |
| ATT0005825 | ATT0005826 |
| ATT0006279 | ATT0006279 |
| ATT0006258 | ATT0006258 |
| ATT0007874 | ATT0007876 |
| ATT0007887 | ATT0007889 |
| ATT0007964 | ATT0007964 |
| ATT0008013 | ATT0008015 |
| ATT0008017 | ATT0008018 |
| ATT0008049 | ATT0008050 |
| ATT0009028 | ATT0009029 |
| ATT0009030 | ATT0009030 |
| ATT0009319 | ATT0009319 |
| ATT0009320 | ATT0009320 |
| ATT0009321 | ATT0009321 |
| ATT0009322 | ATT0009322 |
| ATT0009323 | ATT0009323 |
| ATT0009324 | ATT0009324 |
| ATT0009325 | ATT0009325 |
| ATT0009326 | ATT0009326 |
| ATT0009327 | ATT0009327 |
| ATT0009328 | ATT0009328 |
| ATT0009329 | ATT0009329 |
| ATT0009330 | ATT0009330 |
| ATT0009331 | ATT0009331 |
| ATT0009332 | ATT0009332 |
| ATT0009333 | ATT0009333 |
| ATT0009334 | ATT0009334 |
| ATT0009335 | ATT0009335 |
| ATT0009336 | ATT0009336 |

ATT0009337  ATT0009337
ATT0009338  ATT0009338
ATT0009667  ATT0009672
ATT0009796  ATT0009800
ATT0010388  ATT0010392

# Exhibit 2

**Provided in Native Format**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 20, 2022, I caused a copy of Defendant AT&T Corp.'s Objections and Written Responses to Plaintiffs' First Second of Interrogatories to be served on the counsel of record for each party via electronic mail.

*/s/ Chandler M. Rognes*
Chandler M. Rognes
