# EXHIBIT 1

# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CORE COMMUNICATIONS, INC., CORETEL DELAWARE, INC., CORETEL NEW JERSEY, INC., CORETEL VIRGINIA, LLC, and CORETEL WEST VIRGINIA, INC., <br><br>    Plaintiffs, <br><br>    v. <br><br> AT&T CORP., <br><br>    Defendant. | Civil Action No. 2:21-cv-02771-JDW |

**DECLARATION**
**OF NICHOLAS DEGANI, RETICULATED STRATEGIES LLC,**
**ON BEHALF OF AT&T CORP.**

**I.  Introduction**

1.   My name is Nicholas Degani.  I am the principal of Reticulated Strategies LLC, a strategic consulting firm located in Washington, DC.

2.   I have been identified to serve as an expert witness on behalf of the Defendant in this litigation, AT&T Corp. ("AT&T").

3.   I earned a bachelor of science degree in Electrical Engineering/Computer Science and History from Yale University in 2003 and a law degree from Harvard Law School in 2006.

4.   I was employed by the Federal Communications Commission for more than 13 years. From 2007 to 2011, I was an Honors Attorney in the Commission's Wireline Competition Bureau.  From 2011 to 2012, the Commission detailed me to work for the House Committee on Energy and Commerce, where I was committee counsel and worked with the Subcommittee on Communications and Technology.  From 2012 to 2017, I served as the wireline legal advisor to then-Commissioner Ajit Pai.  From 2017 to 2021, I served as senior counsel to Chairman Ajit Pai, with a two-month detail to serve as acting General Counsel of the agency.

5.   In 2021, I left the Federal Communications Commission to found Reticulated Strategies LLC.  There, I offer strategic consulting to several companies in the technology and telecommunications policy arena.

6.   During my time at the Commission, I became an expert in the long-distance industry, including intercarrier compensation and robocalling.  Notably, as senior counsel to FCC Chairman Ajit Pai, I oversaw the Commission's anti-robocalling strategy from January 2017 through January 2021.  For example, I oversaw the *Advanced Methods to Target and Eliminate*

1

*Unlawful Robocalls* docket, including the blocking of calls from numbers on Do-Not-Originate lists and numbers that are invalid, unallocated, or unused,[1] the creation of the Reassigned Numbers Database,[2] the approval of opt-out call-blocking programs based on reasonable analytics and opt-in white-listing programs,[3] the implementation of safe harbors for voice service providers that block calls based on reasonable analytics or those carried by bad actor providers,[4] and the mandate for all voice service providers to respond to traceback requests and implement effective measures to prevent their networks from being used to originate or transmit illegal calls.[5]

7.  I also oversaw the Commission's implementation of the Pallone-Thune TRACED Act, an anti-robocalling measure, including the Commission's mandate for originating and terminating voice service providers to implement the STIR/SHAKEN Caller ID framework[6] and the extension of that mandate to intermediate voice service providers[7] (both measures to undermine the ability of robocallers to hide their origins through spoofing), as well as measures to combat one-ring scam calls,[8] to designate a single industry-wide consortium to coordinate traceback requests,[9] and to narrow the scope of exemptions from the Commission's anti-robocalling rules.[10]

---

[1] *Advanced Methods to Target and Eliminate Unlawful Robocalls*, CG Docket No. 17-59, Report and Order and Further Notice of Proposed Rulemaking, FCC 17-151 (2017).

[2] *Advanced Methods to Target and Eliminate Unlawful Robocalls*, CG Docket No. 17-59, Second Report and Order, FCC 18-177 (2018).

[3] *Advanced Methods to Target and Eliminate Unlawful Robocalls; Call Authentication Trust Anchor*, CG Docket No. 17-59, WC Docket No. 17-97, Declaratory Ruling and Third Further Notice of Proposed Rulemaking, FCC 19-51 (2019).

[4] *Advanced Methods to Target and Eliminate Unlawful Robocalls; Alarm Industry Communications Committee Petition for Clarification or Reconsideration; American Dental Association Petition for Clarification or Reconsideration*, CG Docket No. 17-59, Third Report and Order, Order on Reconsideration, and Fourth Further Notice of Proposed Rulemaking, FCC 20-96 (2020).

[5] *Advanced Methods to Target and Eliminate Unlawful Robocalls*, CG Docket No. 17-59, Fourth Report and Order, FCC 20-187 (2020) (*Advanced Methods Fourth Order*).

[6] *Call Authentication Trust Anchor; Implementation of TRACED Act Section 6(a) — Knowledge of Customers by Entities with Access to Numbering Resources*, WC Docket Nos. 17-97, 20-67, Report and Order and Further Notice of Proposed Rulemaking, FCC 20-42 (2020).

[7] *Call Authentication Trust Anchor*, WC Docket No. 17-97, Second Report and Order, FCC 20-136 (2020).

[8] *Protecting Consumers from One-Ring Scams*, CG Docket No. 20-93, Report and Order, FCC 20-171 (2020).

[9] *Implementing Section 13(d) of the Pallone-Thune Telephone Robocall Abuse Criminal Enforcement and Deterrence Act (TRACED Act)*, EB Docket No. 20-22, Report and Order and Further Notice of Proposed Rulemaking, FCC 20-34 (2020).

[10] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, FCC 20-186 (2020).

8. In a similar vein, I oversaw numerous anti-robocalling enforcement matters at the Federal Communications Commission[11] and coordinated the Commission's work with the Federal Trade Commission to shut down the sources of several COVID-related scam robocalls.[12]

9. I also have a long history of working on intercarrier compensation issues at the FCC, ranging from the Commission's move to bill-and-keep for terminating traffic[13] to overseeing the Commission's decisions to clarify the VoIP symmetry policies and rule,[14] to curtail intercarrier compensation arbitrage,[15] and to reduce intercarrier compensation arbitrage in the toll-free space.[16]

10. In short, I have extensive experience in the policy, regulation, and practices of the long-distance industry, including how the intercarrier compensation system works as well as the techniques used by robocallers to disguise and hide their traffic and those used by voice service providers to combat robocallers.

## II. Opinions

11. AT&T has asked me to explain the call routing arrangements for toll-free calls, including the routing information available to providers and their control over routing. I focus in particular on upstream voice service providers like Core Communications, Inc. et al. (collectively, "CoreTel") and interexchange carriers like AT&T. I then explain how this information and control affects those providers' ability to identify toll-free robocalls.

12. To address these issues, I briefly review some telecommunications industry jargon, walk through how long-distance and toll-free calling work, and then explain the basics of the robocalling business. I next discuss the control that upstream providers have vis-à-vis interexchange carriers over who transmits calls over their network. And I then explain the

---

[11] *See, e.g.*, *Scott Rhodes a.k.a. Scott David Rhodes, Scott D. Rhodes, Scott Platek, Scott P. Platek*, File No.: EB-TCD-18-00028178 NAL/Acct. No.: 202032170002 FRN: 0029168846, Forfeiture Order, FCC 21-16 (2021); *Affordable Enterprises of Arizona, LLC*, File No.: EB-TCD-17-00024974 NAL/Acct. No.: 201832170003 FRN: 0027881093, Forfeiture Order, FCC 20-149 (2020); *Best Insurance Contracts, Inc., and Philip Roesel, dba Wilmington Insurance Quotes*, File No.: EB-TCD-16-00023195 NAL/Acct. No.: 201732170007 FRNs: 0026727396 (Best Insurance Contracts, Inc.); 0026727446 (Roesel, dba Wilmington Insurance Quotes), Forfeiture Order, FCC 18-134 (2018); *Adrian Abramovich. Marketing Strategy Leaders, Inc., and Marketing Leaders, Inc.*, File No.: EB-TCD-15-00020488 NAL/Acct. No.: 201732170006 FRN: 0026627141, Forfeiture Order, FCC 18-58 (2018).

[12] FCC, FTC Demand Robocall-Enabling Service Providers Cut Off COVID-19-Related International Scammers, Public Notice, https://docs.fcc.gov/public/attachments/DOC-364482A1.pdf (2020).

[13] *Connect America Fund et al.*, WC Docket Nos. 10-90, 07-135, 05-337, 03-109, GN Docket No. 09-51, CC Docket Nos. 01-92, 96-45, WT Docket No. 10-208, Report and Order and Further Notice of Proposed Rulemaking, FCC 11-161 (2011).

[14] *Connect America Fund; Developing a Unified Intercarrier Compensation Regime*, WC Docket No. 10-90, CC Docket No. 01-92, Order on Remand and Declaratory Ruling, FCC 19-131 (2019).

[15] *Updating the Intercarrier Compensation Regime to Eliminate Access Arbitrage*, WC Docket No. 18-155, Report and Order and Modification of Section 214 Authorizations, FCC 19-94 (2019); *Updating the Intercarrier Compensation Regime to Eliminate Access Arbitrage*, WC Docket No. 18-155, Order on Reconsideration, FCC 20-79 (2020).

[16] *8YY Access Charge Reform*, WC Docket No. 18-156, Report and Order, FCC 20-143 (2020) (*8YY Reform Order*).

3

informational asymmetry between upstream providers and interexchange carriers in identifying robocalls.

13.     I conclude that upstream voice service providers, like CoreTel, are in the best position to identify whether a toll-free call is a legitimate call or an illegitimate robocall vis-à-vis a downstream Interexchange Carrier, like AT&T.  The upstream voice service providers have more control over who delivers calls onto their network and better access to the information needed to identify a robocall.

14.     *Telecom Terminology.*—Because the amount of jargon in telecommunications law and policy is significant, I start by defining a few terms as I understand them and as I plan to use them in this declaration.

15.     *First*, every company involved in the transmission of a telephone call, regardless of the technology used, is a "voice service provider," sometimes shortened to "service provider" or "provider."

16.     *Second*, the "calling party" is the person or machine dialing and placing a telephone call.  The "called party" is the person or machine that is supposed to receive a particular telephone call.  In a call, the voice service provider that has a direct relationship with the calling party is the "Originating Provider."  The service provider that has a direct relationship with the called party is the "Terminating Provider."  Any other service providers in between the two are "Intermediate Providers."

17.     *Third*, some voice service providers are "telecommunications carriers," which offer service "for a fee"[17] and on a common carrier basis.  Other voice service providers are "private carriers," i.e., voice service transmission providers that may not charge a fee or do not offer service on a common carrier basis.  As a general matter, the Federal Communications Commission and State commissions have broad regulatory authority over the activities of telecommunications carriers and less authority over private carriers.

18.     Some private carriers may be "enhanced service providers" or "information service providers."  For example, some companies offering interconnected voice over Internet protocol (VoIP) service claim to be information service providers.  The FCC and State commissions have relatively little general regulatory authority over enhanced service providers or information service providers.

19.     These terms apply based on the particular service and the relationship of the voice service provider with its customer.  A voice service provider can be a telecommunications carrier with respect to some services or customers and a private carrier or information service provider with respect to others.  Similarly, an Originating Provider, Intermediate Provider, or Terminating Provider may be a telecommunications carrier or a VoIP provider.

20.     *Fourth*, to the extent a telecommunications carrier is routing calls locally, it is acting as a "local exchange carrier" or "LEC."  By statute, each LEC has a "telephone exchange" or "telephone exchange area" in which it provides service.[18]  To the extent a telecommunications

---

[17] Communications Act § 3, 47 U.S.C. § 153.

[18] Communications Act § 3, 47 U.S.C. § 153.

4

carrier is routing calls long distances (between and across telephone exchanges), it is acting as an "interexchange carrier" or "IXC."

21. Notably, a LEC has the ability to tariff various originating access charges for toll-free calls that must be paid by the IXC routing the call, provided that the LEC files and abides by the tariff. The furthest upstream voice service provider to tariff such charges is generally known as the "Originating LEC" and any downstream LEC that also tariffs access charges is an "Intermediate LEC."

22. *Fifth*, before the Telecommunications Act of 1996, LECs were generally given a monopoly on that service within their territory. After the elimination of those monopolies in the Telecommunications Act, those LECs were termed "incumbent LECs." LECs entering the local market after the Telecommunications Act are "competitive LECs." Incumbent LECs are generally much more heavily regulated than competitive LECs.

23. *Call Routing.*—To ensure a common baseline for the following discussion, let me walk through how calls are made and routed on the telephone system, as I understand it.

24. Let's start with phone numbers. Telephone numbers in the United States follow a predefined format: NPA-NXX-XXXX. The "NPA" is the area code of the called party, more formally known as the Numbering Plan Area. The "NXX" traditionally identifies the central office or exchange in the Numbering Plan Area where the call must be routed. And the "XXXX" identifies the particular device or station to be called.

25. Unlike standard long-distance calls, toll-free calls are identified by three signifying digits instead of an NPA: "800", "888", "877", etc. Collectively, the three-digit identifiers for toll-free calls are referred to as 8YY (since they all begin with the number 8). The remaining digits of the toll-free number are simply an identifier—they do not correlate with a particular central office or even a specific telephone/station.

26. Figure 1 lays out the routing of a traditional long-distance call. Here, the calling party receives local service from a LEC and long-distance service from an IXC of its choosing. When the Originating Provider (the LEC) receives the call from its customer, it determines that the call is long-distance. Because the Originating Provider is a LEC and tariffs originating access, it is also the Originating LEC here. The Originating Provider routes the call within its telephone exchange area to the calling party's chosen IXC. The IXC examines the dialed number to determine which Terminating Provider has the called party as a subscriber. The IXC routes the call to that particular Terminating Provider. The Terminating Provider then routes the call to the called party.

*Figure 1 – A Simple Long-Distance Call*



27. Figure 2 lays out the mechanics of a simple toll-free call. The calling party still receives local service from a LEC. When the LEC receives the call from its customer, it determines that the call is to a toll-free number. The LEC thus functions as the Originating LEC, but it does not

5

yet know where to route the call because toll-free calls must be routed to the *called party*'s IXC, not the calling party's own IXC. As such, the LEC queries a toll-free database that identifies the carrier information code (or CIC in telecom jargon) identifying the chosen IXC for a particular toll-free number. Once the Originating LEC has received that information, it routes the toll-free call through its telephone exchange area to the called party's IXC, and the IXC routes the call to the called party. (note that a Terminating LEC does not play a necessary role in a toll-free call since the IXC has direct relationship with the called party.)

*Figure 2 – A Simple Toll-Free Call*



28. These two diagrams simplify how actual call routing works in at least two ways in my experience.

29. *First*, the diagrams show the simplest arrangement of the call-handoff chain, when the Originating Provider uses a direct connection with the IXC (i.e., when the two are physically interconnected with one another and the Originating LEC chooses to use that route).

30. An Originating Provider may also use an indirect connection, routing each call through one or more Intermediate Providers before the call reaches the IXC. Figure 3, for example, shows a standard long-distance call routed through two Intermediate Providers.

*Figure 3 – A Long-Distance Call with Two Intermediate Providers*



31. In my understanding of industry terminology, this routing of a call from one provider to the next is typically called a "call-handoff chain" or "call chain." Carriers closer to the calling party in the call chain are "upstream" from others (because they are closer to the source of the call), and carriers closer to the called party in the call chain are "downstream" from others.

32. Note that there may be more (or fewer) Intermediate Providers used to complete any given call. Importantly, the Originating Provider and each Intermediate Provider gets to choose who they hand the call off to next. In other words, the length of the chain is controlled by the upstream carriers; the IXC has little to no control.

33. Note also that the toll-free database query—to determine the Calling Party's IXC—need not be done by the Originating Provider—any Intermediate Provider that is a LEC can do such a

6

query. The primary industry expectation, in my experience, is that the query will only be done once for any given toll-free call, and the result of that query (the CIC) will be passed along to other providers in the chain to ensure the call reaches the called party's IXC.

34. Taking these points together, this case illustrates how a toll-free call may be routed across multiple providers. Specifically, figure 4 shows my understanding of how most toll-free calls appear to be routed through CoreTel: The Originating Provider routes the call through one or more Intermediate Providers, the last of which is CoreTel's customer; that customer then routes the call to CoreTel; CoreTel queries the Toll-Free Database to determine the Called Party's IXC and then routes the call to yet another Intermediate Provider, which routes the call to the appropriate IXC.

*Figure 4 – Toll-Free Call Routing Through CoreTel*

Calling Party → Originating Provider → Other Intermediate Providers? → CoreTel Customer (Intermediate Provider) → CoreTel (Intermediate Provider) → Intermediate Provider → Called Party's IXC → Called Party

CoreTel ↔ Toll-Free Database

35. *Second*, these figures simplify how call routing works by omitting the specific equipment used to route a call. In traditional network design, for example, a long-distance call will first route over the Originating Provider's last-mile facilities (such as a twisted pair of copper wires) to a particular central office owned by that LEC. The Originating Provider might then transport that call to an Intermediate Provider that owns a tandem switch, and the Intermediate Provider has a particular physical connection to route calls to a particular IXC. In other words, the Originating Provider and each Intermediate Provider know precisely where a call enters and exits its network.

36. In more modern networks (that rely on VoIP, for example), the Originating Provider may not have last-mile facilities to a customer, but it will still be able to verify who the customer is through technological means. For example, it may identify a customer by its IP address or through a cryptographic certification. Either way, the Originating Provider—and each Intermediate Provider in the call chain—has a technological way of identifying where the call entered and exited its network and who sent it.

37. *The Robocalling Business.*—In my experience, robocallers have learned that they can profit from robocalls even if no human being ever answers the calls. To do this, robocallers exploit the intercarrier compensation system, a system that requires some carriers (generally IXCs) to pay others (generally Originating LECs) for "access services," with some portion of those payments eventually reaching the robocaller through a complex set of arrangements. Given the facts of this case, I focus on calls to toll-free numbers.

38. As I understand it, the FCC has said that robocalls to toll-free numbers are "illegitimate calls" and are a form of "abuse [that] involves the generation of 8YY traffic that has no legitimate purpose and exists solely for the purpose of obtaining intercarrier compensation."[19]

---
[19] *8YY Reform Order*, FCC 20-143, at para. 17.

7

39. In my experience, that's true. When answered, robocalls to toll-free numbers may offer only dead air, recordings of the sounds of nature and the city, or the pre-recorded sounds of someone waiting and pushing random numbers on their phone. The purpose of these calls, after all, is not to communicate with the toll-free number owner but instead to generate network traffic. And such calls are almost never detected in real time because toll-free numbers are usually monitored in the first instance by interactive voice response software or phone key input software, not a human being.

40. How does a toll-free access arbitrage scheme work? At least two parties are always involved: The robocaller and a voice service provider partner. The robocaller generates toll-free calls, which it ensures are routed through its partner. Once the partner receives payments for that toll-free traffic, it shares some portion with the robocaller.

41. The voice service partner could potentially be any provider in the call-handoff chain—it could be the Originating Provider, the first Intermediate Provider, the second Intermediate Provider, etc. A robocaller may have more than one voice service provider partner, receiving payments from multiple providers in the chain. And note that a voice service provider partner has multiple options for receiving its own payments: It can be the Originating LEC (the first provider in the chain that tariffs originating access charges), an Intermediate LEC (a later provider that tariffs such charges), or just another provider that receives compensation from its downstream partner.

42. The key to the entire enterprise is the Originating LEC, which usually has the highest tariffed charges and thus is the central funnel through which payments are made to upstream voice service partners and ultimately robocallers themselves.

43. Figure 5 shows an example of the payment flows when a robocaller (the calling party) partners with its Originating Provider (both in blue). Here the robocall is routed by the Originating Provider through an Intermediate Provider, which then routes it to another Intermediate Provider that functions as the Originating LEC (querying the toll-free database and tariffing charges to the IXC). After the query, the Originating LEC routes the toll-free call to the called party's IXC. The IXC in turn pays the Originating LEC the originating access charges due, which gives a share of those charges to the first Intermediate Provider, which passes along a share to the Originating Provider. Because the Originating Provider is the robocaller's partner, it then shares some of its revenues with the robocaller. As before, the routing of the call is shown in black, and the various payment flows are shown in green.

*Figure 5 – Example of a Toll-Free Robocall Payment Flow*



44. *Controlling the Source of a Call.*—The above overview of the toll-free robocalling business model leads naturally to the first significant difference between Originating Providers

8

and Intermediate Providers (collectively, "upstream providers") and IXCs: Upstream providers have far more ability to stop robocalls from entering their network in the first place than IXCs do. That's because upstream providers have far greater ability to control *who* they receive traffic from than IXCs do.

45. Start with the most basic point: To route traffic onto an Originating Provider or Intermediate Provider's network, a customer must generally sign a contract. Indeed, as I understand it, in this case CoreTel (or its affiliate) has a signed contract with each of its customers.[20]

46. Because routing through such a provider requires a contract, an upstream provider can identify who a customer is before routing its traffic, can apply industry-standard "Know Your Customer" policies to decide whether that customer is trustworthy or liable to transmit robocalls to it, and can decide what price it might pay (if any) for toll-free traffic. If the upstream provider believes that a customer is likely to initiate robocalls, it need not sign a contract or can terminate service if it's already commenced.

47. To put it another way, an Intermediate Provider in the toll-free origination business, such as CoreTel, has significant ability to control the source of its calls because it has the ability to pick and choose, via contract, who it accepts traffic from and the conditions attendant to such acceptance. If an Intermediate Provider is paying its upstream customers for toll-free traffic and expecting to be paid for originating that toll-free traffic by an IXC, i.e., it is also functioning as an Originating LEC, a diligent provider would, in my experience, look to ensure that it had the same information over calls entering its network that an Originating Provider would. That would mean not just knowing its own customers but its customers' customers as well and so on, all the way back to the calling party. If a customer refused to identify its own upstream customers, that would be a red flag—how can an Intermediate Provider conduct due diligence on a potential source of robocalls if it's not identified? And in my experience a diligent Intermediate Provider takes these responsibilities seriously: After all, by tariffing charges as an Originating LEC, the Intermediate Provider is representing that it is providing access to *its own* telephone exchange area.

48. Contrast this with an IXC, which generally cannot pick and choose its upstream partners but generally must accept toll-free traffic passed to it from across the network. After all, the relevant contract the IXC has is with the toll-free number owner. Because most toll-free traffic is subject to tariffed charges, the IXC is unlikely to know at the time it receives the traffic who originated it or what Originating Provider first routed it or even how many Intermediate Providers are in the call-handoff chain. Indeed, all the IXC may know is the last Intermediate Provider in the call-handoff chain, which is often an aggregator that interconnects with numerous Intermediate Providers that may span some or all of the 50 states.

49. This lack of information and control puts the IXC at a distinct disadvantage vis-à-vis an upstream provider like an Intermediate Provider. Without a contract, it cannot first impose Know Your Customer or other policies on its upstream providers. Indeed, an IXC must

---

[20] *See, e.g.*, CORE 14058, CORE 17758, CORE 17992, CORE 17885, CORE 17968, CORE 18170, CORE 18003, CORE 18055, CORE 18067, CORE 17795, CORE 18082, CORE 18093, CORE 17980, CORE 17939, CORE 18104, CORE 14067, CORE 14079, CORE 18027, CORE 18138, CORE 18153, CORE 18155, CORE 18159, CORE 17843, CORE 17925, CORE 18150, CORE 18173, CORE 17898.

9

generally accept any tariffs created by Originating LECs and Intermediate LECs and are bound to them, even if the IXC would prefer not to accept traffic from a particular LEC at all.

50. What is more, the IXC may not even know who its upstream LEC is at the time a call is routed—the identity of the Originating LEC or Intermediate LEC(s) that expect to be paid for routing a call is not transmitted with the call itself. It is only after the fact, when an IXC receives a bill from a LEC, that it learns who the LEC is. (What is more, because bills for originating access charges generally do not list out each and every call routed, an IXC may not even know which toll-free calls have been routed through the billing LEC until months after the fact.)

51. In sum, an upstream provider can pick and choose who their customers are and can, via contract, control the source of the calls they route whereas an IXC cannot. As such, an Intermediate Provider like CoreTel is better operationally equipped to control whether robocalls enter the network than an IXC like AT&T.

52. *Identifying Robocalls.*—Next, it's necessary to look at the informational differences between upstream providers and IXCs. In my experience, robocallers use a number of tactics to generate sufficient traffic to be profitable and to disguise that traffic.[21] In this section, I discuss four of those tactics and explain that upstream providers (like CoreTel) generally are better positioned to identify robocalls on their network than IXCs (like AT&T) are. That's because upstream providers are closer to the source of calls and have more information about the source and propriety of calls transiting their network.

53. *First* and most obviously, a robocaller must generate a large number of robocalls. In my experience, a robocaller will generate such calls using automated software and equipment through a "robocalling campaign" or "campaign." A campaign is a set of hundreds, thousands, or more robocalls that are designed with a particular purpose (such as toll-free access arbitrage) and that rely on a particular set of tactics to disguise the calls as legitimate traffic.

54. Looking for spikes in traffic or identifying a robocalling campaign based on the volume of calls becomes increasingly difficult as you move downstream in the call-handoff chain. Or to put it another way, as you move down the call-handoff chain, the robocalling *signal* tends to remain the same whereas the *noise* from legitimate traffic increases. For example, a thousand-call campaign would stand out to the Originating Provider compared to the one or two toll-free calls you might expect from a household; a thousand-call campaign would still stand out to the first Intermediate Provider compared to the thousand or so toll-free calls that you might expect from a particular Originating Provider; it could be somewhat difficult to distinguish for other Intermediate Providers; and it would be nigh impossible for an IXC to distinguish amidst the hundreds of thousands of calls traversing its network.

55. In short, an Intermediate Provider like CoreTel is better positioned than an IXC like AT&T to identify a campaign because it is closer to the source of a campaign and thus the campaign has less legitimate traffic to hide in.

---

[21] One additional tactic used by robocallers, and not discussed in detail here, is laundering or "washing" toll-free traffic through long and complicated call-handoff chains to disguise its origins. Although the presence of a long string of Intermediate Providers between the source of a toll-free call and the IXC is evidence of a potential robocalling scheme, neither the Intermediate Provider nor the IXC has an informational advantage in identifying such a scheme in general and so the existence of laundering does not change my analysis.

56. *Second*, a robocaller will dial multiple toll-free numbers, not just one. This tactic reduces the volume needed to any given toll-free number, reducing suspicions by the called party. This tactic also reduces the number of robocalls from a robocalling campaign that any one IXC sees. After all, each IXC only sees the toll-free robocalls that are destined for its own customers. Spreading robocalls across multiple IXCs makes it more difficult for any particular IXC to spot the trend.

57. To the extent a robocaller routes all or most of its traffic through a single Intermediate Provider, that Intermediate Provider is in a prime position to spot and terminate a robocalling campaign.

58. In contrast, an IXC will likely see only a fraction of the campaign because no IXC controls more than a fraction of the toll-free termination market. As such, a campaign of one thousand calls to one thousand toll free numbers may instead look like two hundred calls to two hundred toll free numbers—an amount of traffic much more likely to be within the normal call volumes.

59. *Third*, a robocaller must decide when its toll-free calls occur and how long they last. In my experience, the industry labels the analysis of these patterns "traffic analysis."

60. A robocaller faces the natural question of what time of day its calls occur. In my experience, a less sophisticated robocaller will place toll-free calls throughout the day and night to maximize the volume of calls. A more sophisticated robocaller, in contrast, will limit the number of toll-free calls it places during evening and night-time hours, recognizing that consumers rarely place such calls during those hours.

61. A robocaller must also decide how long its calls should be. On the one hand, longer calls may be more profitable—most access charges scale with the number of minutes of use. On the other hand, shorter calls evade detection by the owner of a toll-free number more easily (for a very short call, it's almost impossible for the owner to distinguish between a mis-dial by a legitimate consumer and the dead air of a robocaller). In my experience, an unsophisticated robocaller is likely to keep its calls quite short. A more sophisticated robocaller, in contrast, tends to vary the length of its calls so that they appear more like regular dialing patterns (a few very short, many last a few minutes, and a few very long).

62. As above, an Intermediate Provider like CoreTel is better positioned to identify a robocalling campaign than an IXC like AT&T using traffic analysis because it is closer to the source. A surge in the number of night-time toll-free calls or the number of very short toll-free calls is not so hard to detect in a single telephone exchange area but it becomes significantly harder to detect as it becomes intermixed with additional legitimate traffic from across the country. Or to put it another way: For an Intermediate Provider, traffic analysis might show a needle; but when a downstream IXC conducts such an analysis, all it might show is a haystack.

63. *Fourth*, a robocaller will generally spoof the caller ID of its calls. When you place a call on the telephone network, your own telephone number usually travels with it, from the Originating Provider to any Intermediate Provider to the IXC (and showing up as the caller ID to the called party). Spoofing is the practice of changing the telephone number that travels with your call so the called party sees a false caller ID (as do the providers transmitting the call).

11

64. As the FCC has put it: Spoofing is "often used to facilitate fraudulent and other harmful activities."[22] So my understanding is that federal law specifically prohibits spoofing with the "intent to defraud, cause harm, or wrongfully obtain anything of value,"[23] which would seem to include spoofing to mask the source of a toll-free access arbitrage scheme.[24]

65. Spoofing can be done on a call-by-call basis. So if a robocaller's number was actually 202-555-1000, its caller ID might show up as 617-555-1000 for one call, 202-555-1234 for the next, 310-555-3254 for the third, and so on. Spoofing can let a robocaller make a million calls dialed by the same software/equipment look like a million calls each dialed by a separate human being. The software/equipment needed to spoof is inexpensive. As such, spoofing is an essential tool for a robocaller involved in toll-free arbitrage.

66. As before, an Intermediate Provider like CoreTel is better positioned to identify spoofed traffic than an IXC like AT&T—and that's especially true when the Intermediate Provider is tariffing originating access charges.

67. Let me unpack that a bit. Generally, an Originating Provider (or its numbering partner) will assign one or more telephone numbers to each of its customers. Legitimate telephone numbers remain geographically bounded: For example, a new customer based in the 724 area code will receive a 724 telephone number, whereas a new customer based in the 570 area code will receive a 570 telephone number.[25]

68. As such, any Intermediate Provider functioning as an Originating LEC has significant capacity to identify spoofed calls. For example, if the Originating LEC's telephone exchange area is the state of Pennsylvania, it should expect that most if not all calls routed through that switch will bear a Pennsylvania area code. If an Originating LEC receives a toll-free call whose caller ID suggests an out-of-state origin, there are only a few possible explanations: (1) The call did in fact originate out of state, (2) the call originated in state by a wireless caller, (3) the call originated in state by a nomadic VoIP caller who moved into the state, or (4) the call originated in state but the number was spoofed.

69. If the Intermediate LEC is largely reliant on charging IXCs for the toll-free calls it routes, each of these possibilities is concerning. (1) If a call originates out of state (or even out of country), it would be outside the LEC's telephone exchange area, and the LEC could not charge originating access fees for the call.[26] (2) If a call originated in state by a wireless caller, it would

---

[22] *8YY Reform Order*, FCC 20-143, at footnote 49.

[23] 47 CFR § 64.1604.

[24] Note that spoofing does have limited, legitimate purposes. For example, a company may use spoofing so that all calls from a telemarketing call center show the same, centralized number. To comply with federal law, however, the company would have to display a number assigned to it. Similarly, a battered spouse may use a spoofed number when calling a relative to protect her identity from her abusive spouse. In such cases, the voice service provider will generally assign the spoofed number to the woman to ensure that no one receives calls to it. In short, the legitimate uses of spoofed numbers are relatively limited and generally do not arise when a person is dialing a toll-free number. And in my experience, legitimate spoofing when calling a toll-free number is extraordinarily rare.

[25] The industry also maintains a database of what phone numbers can be assigned in what areas by which providers.

[26] An LEC, by statute, provides telephone exchange service throughout a telephone exchange area. Communications Act § 3. To become a LEC, a company must generally get a certificate from a state commission. In my experience, most companies do so by creating a shell company for purpose of operations in that state. As an example, company TelCo might have PennCo as its subsidiary for Pennsylvania LEC operations and OhioCo as its

12

be a wireless-to-toll-free call, and the LEC could not charge most originating access fees for the call. (3) If a call originated in state by a nomadic VoIP caller who moved into the state, it would be a non-facilities-based call, and the LEC could not charge most originating access fees for the call. (4) If the call's number was spoofed, it would be illegitimate traffic, and the LEC could not charge originating access fees for the call.

70. Recall again that an Intermediate Provider, like this Originating LEC, has significant ability to control the source of its calls because it has the ability to pick and choose, via contract, who it accepts traffic from. As such, if an Intermediate Provider is paying its upstream partners for toll-free traffic and expecting to be paid for originating that toll-free traffic by an IXC, a diligent LEC would, in my experience, look to limit the number of calls that originate out of state or that originate from a wireless network. And while such an Intermediate Provider might be willing to accept calls from nomadic VoIP callers, it would, in my experience, recognize that interstate number porting is relatively rare and that when it does occur, the associated number tends to be regularly used. In other words, an Intermediate Provider in this situation would expect most caller IDs to originate from the state it serves, with a small number of out-of-state numbers popping up repeatedly. If the Intermediate Provider sees a large number of out-of-state telephone numbers traversing its switch, that's strong evidence of spoofing.

71. Contrast this with an IXC, which generally must accept toll-free traffic passed to it from across the network, aggregated across multiple Intermediate Providers that may span some or even all of the 50 states. Indeed, because it is perfectly legal to route out-of-state or wireless traffic through an Intermediate Provider before reaching an IXC, the IXC cannot assume such traffic is spoofed. In my experience, the IXC instead assumes that the traffic is simply legitimate but not subject to (most) originating access charges. In short, an IXC cannot so easily assess whether traffic is spoofed or not.[27]

72. *Stepping back*, it's worthwhile to unpack the effectiveness of these tactics in combination. Let's say a toll-free access arbitrageur needs to make one million toll-free calls to be profitable. By spoofing a different number for each call, dialing many different toll-free numbers, and routing them through multiple providers, a robocaller can make what might have

---

subsidiary for Ohio LEC operations. Each such LEC may then tariff access charges (i.e., charges for accessing end users in the LEC's telephone exchange area) at the same and federal level. And each such LEC may only assess access charges on calls that originate in its own telephone exchange area.

To illustrate further why calls must originate in a LEC's telephone exchange area, let's say a Pennsylvania did route an intrastate that originated and terminated in California. If that LEC wanted to charge access fees, what tariff would it use? It could not apply the federal access tariff because those only apply to interstate calls. And it could not apply the Pennsylvania access tariff because that only applies to calls originated in Pennsylvania. This is no small problem in my experience, as tariffs routinely assume that about 50% of originating calls are intrastate in nature. *See, e.g.*, Core Communications, Inc. et al. FCC Tariff No. 3 § 2.9.2.C.1 (May 15, 2015 version).

[27] I should note that there is one category of spoofed numbers where informational differences amongst providers is minimal: unassigned numbers. These are number that are either invalid (e.g., all zeros) or that have not been allocated to any provider for assignment. Because neither the upstream provider nor the IXC are better positioned to identify such numbers, there existence does not change my overall analysis.

That said, it is generally more efficient, in my experience, for such identification efforts to be done by upstream providers because any efforts to curb spoofing by those providers will generally catch spoofing that uses unassigned numbers. For example, if an Intermediate Provider were checking to ensure that the calls it routes are from within its telephone exchange area, it would automatically flag any calls made with an invalid number.

13

looked like a one-million-call robocalling campaign appear, to the IXC, as 125,000 individual calls routed via one particular Intermediate Provider to a set of toll-free numbers and another 125,000 individual calls routed via a different Intermediate Provider to a slightly different set of toll-free numbers.

73. Continuing with that same example, it would be a daunting task for an IXC to get a full sense of the scope of a robocalling operation even if the IXC determines that a subset of these calls from one particular Intermediate Provider are in fact robocalls. *For one*, the IXC would need to determine, somehow, that not just the calls it detected but 125,000 calls from that particular Intermediate Provider were robocalls. *For another*, the IXC would need to determine the source of each of those calls to connect them as a single robocalling operation. That task is no small feat—the Intermediate Provider may only be the first in a long chain of providers. Each layer adds friction to an investigation, slowing it down or ending it if a provider refuses to cooperate (e.g., by claiming that divulging customer information is competitively sensitive or confidential). *For yet another*, even if the IXC can tie together the 125,000 robocalls from a single Intermediate Provider, it would need to piece together that the 125,000 calls it received from the second Intermediate Provider were also robocalls *and* from the same source. That would require determining the sources of the calls for that second Intermediate Provider, along with the sources of any Intermediate Providers that it serves, etc. *For still yet another*, even then the IXC would only see 250,000 robocalls, a mere 25% of the total. To get the full picture, it would need to coordinate with every other IXC serving toll-free numbers (each of whom is likely receiving calls from multiple Intermediate Providers, and so forth). In short, the further downstream a service provider is, the harder it is to reconstruct what's actually going on.

74. In contrast, consider an Intermediate Provider that's functioning as an Originating LEC, and directly or indirectly funneling money to a robocalling campaign. Such an Intermediate Provider would be in a much better position to track down the campaign. Unlike the IXC, the Intermediate Provider would see all the toll-free calls cross its network, not just the subset destined for the toll-free customers of a particular IXC. Unlike the IXC, the Intermediate Provider would know which additional Intermediate Providers those calls are routed through before reaching the IXC and where they came from—in other words, the call-handoff chain is shorter for the Intermediate Provider and more transparent to it. Unlike the IXC, the Intermediate Provider would know that all calls routed through a particular switch are supposed to be from that telephone exchange area, and they could thus better identify spoofed calls or illegitimate changes in volume or traffic patterns. And unlike the IXC, the Intermediate Provider has contracts with each of the upstream providers routing toll-free traffic through it, and thus they have the opportunity to ensure that those customers—and their customers and so on—do in fact respond to tracebacks and investigations in a timely manner, speeding any investigation.

75. It's for all these reasons together that the FCC has said "[o]riginating and intermediate voice service providers are integral to stopping illegal calls, and the steps we take here further enlist them in the fight."[28] I think it worthwhile to lay out the Commission's reasoning on this point in full, as I understand it:

> "Originating and gateway voice service providers are best positioned to prevent illegal calls by stopping them before they enter the network. When originating

---

[28] *Advanced Methods Fourth Order*, FCC 20-187, at para. 14.

14

and gateway providers stop these calls in the first instance, it ensures that illegal traffic never enters the network, let alone reaches consumers. This reduces unnecessary load on our communications network and especially benefits the customers of smaller or rural voice service providers that may be unable to implement robust blocking programs. It also permits voice service providers to be less aggressive in their opt-in or opt-out blocking programs without worrying that they are leaving their customers unprotected. This in turn benefits callers that wish to use high-volume calling services lawfully by reducing the risk that their calls will be blocked in error."[29]

76. And in 2020, I understand that the FCC determined that Originating Providers and Intermediate Providers were not living up to industry and regulatory expectations. That's why, as I understand it, the FCC mandated that Originating Providers and Intermediate Providers take steps to stop calls earlier in the telephone chain before they enter the broader telephone network, requiring them to adopt Know Your Customer policies and other "affirmative, effective measures to prevent new and renewing customers from using their network to originate illegal calls."[30]

77. *Conclusion.*—In all, I believe that upstream voice service providers, like CoreTel, are in the best position to identify whether a toll-free call is a legitimate call or an illegitimate robocall vis-à-vis IXCs, like AT&T. They have more control over who delivers calls onto their network and better access to the information needed to identify a robocall.

78. I declare under penalty of perjury that the foregoing is true and correct. Executed on December 23, 2022.


Respectfully submitted,


s/ Nicholas A. Degani
Nicholas A. Degani, Principal, Reticulated Strategies LLC

---

[29] *Advanced Methods Fourth Order*, FCC 20-187, at para. 33.

[30] *Advanced Methods Fourth Order*, FCC 20-187, at para. 32.