EXHIBIT 36

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CORE COMMUNICATIONS, INC., CORETEL DELAWARE, INC., CORETEL NEW JERSEY, INC., CORETEL VIRGINIA, LLC and CORETEL WEST VIRGINIA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> AT&T CORP., <br><br> Defendant. | Civil Action No. 2:21-cv-02771-JDW <br><br> Hon. Joshua D. Wolson |

### PLAINTIFFS' SECOND SUPPLEMENTAL RESPONSES TO AT&T CORP.'S FIRST SET OF INTERROGATORIES

Pursuant to Federal Rule of Civil Procedure 33, Plaintiffs Core Communications, Inc., CoreTel Delaware, Inc., CoreTel New Jersey, Inc., CoreTel Virginia, LLC, and CoreTel West Virginia, Inc. (collectively, "CoreTel") hereby provide second supplemental responses ("Responses") and objections to Defendant AT&T Corp.'s ("AT&T") First Set of Interrogatories.

### GENERAL OBJECTIONS

1. CoreTel submits these Responses for itself subject to, without waiver of, and expressly reserving the right at any time to amend, revise, correct, supplement, or clarify any of the Objections and Responses herein. CoreTel also reserves the right to rely, at time of trial or other proceedings in this action, upon documents and evidence in addition to the Responses herein.

2. CoreTel submits these Responses subject to, without waiver of, and expressly preserving: (a) any objections as to the competency, relevance, materiality, privilege, or admissibility of any of the Responses or any of the documents, if any, identified in any of the

1

Responses hereto; (b) the right to object to other discovery procedures involving or relating to the subject matter of the Responses herein; (c) the right to object on any ground, at any time, to such other or supplemental interrogatories that any party may at any time propound, involving or relating to the subject matter of these interrogatories.

3. CoreTel has not completed its investigation of the facts and documents relating to this action and that may be responsive to these interrogatories. Consequently, CoreTel responds to each Interrogatory to the best of its present existing knowledge. CoreTel reserves its rights to amend, revise, correct, supplement, or clarify any of the objections and Responses. Moreover, the Responses contained herein are not intended to and shall not preclude CoreTel from making any contentions or relying upon any facts or documents, if any, whether or not identified or relied upon herein.

4. CoreTel objects to these Interrogatories to the extent that they conflict with or purport to expand upon CoreTel's obligations under the Federal Rules of Civil Procedure and Local Rules of the United States District Court for the Eastern District of Pennsylvania, including but not limited to Federal Rule of Civil Procedure 26(b).

5. CoreTel objects to these Interrogatories to the extent they seek information that is not relevant to any party's claim or defense or proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

6. CoreTel objects to each Interrogatory to the extent that it requests information subject to the attorney-client privilege, work product doctrine, joint defense or common interest privilege, or any other applicable privilege or information which is otherwise immune or

protected from discovery. CoreTel will not produce such information. To the extent any such information is inadvertently produced, such production is not intended as any waiver of the attorney-client privilege, doctrine, or any other applicable privilege.

7. CoreTel objects to the extent each Interrogatory seeks documents or information concerning customers of CoreTel other than Defendant on the grounds that such requests seek confidential, proprietary, and potential trade secret information of those other customers and on the further grounds that CoreTel is contractually bound with its customers to hold such information confidential and to provide advance notice and opportunity to object to efforts to obtain such documents and information from CoreTel, and to allow those customers opportunity to seek a protective order from the Court.

8. Should CoreTel inadvertently produce, reveal or identify privileged information that is protected from disclosure by the attorney-client privilege, work product doctrine, or any other applicable privilege, such production, revelation or identification shall not operate as a waiver of any such privilege or doctrine.

9. CoreTel objects to the Interrogatories to the extent that they seek information gathered or prepared at the direction of counsel in anticipation of litigation.

10. CoreTel objects to these Interrogatories to the extent that they require CoreTel to supply information that is a matter of public record or otherwise available to the propounding party.

11. CoreTel objects to these Interrogatories to the extent they assume the truth of facts not proven or facts not in evidence.

12. CoreTel objects to these Interrogatories to the extent they seek information that is the subject of document discovery.

13.     CoreTel objects to these Interrogatories to the extent that they require CoreTel to render legal conclusions regarding contested legal or factual issues or to the extent that any interrogatory is otherwise objectionable, burdensome, oppressive, or premature at this stage of the litigation.

14.     CoreTel objects to these Interrogatories to the extent that they seek information that is the subject of expert testimony.

15.     These General Objections are incorporated into each of the responses to the interrogatories set forth below.

## RESPONSES AND SPECIFIC OBJECTIONS

**INTERROGATORY NO. 5:**

Identify each of CoreTel's Customers, including all originating providers, for which You transmitted traffic to AT&T, and provide each customer's unique identifier number. This Interrogatory includes but is not limited to identifying all of your VoIP partners.

**RESPONSE TO INTERROGATORY NO. 5:**

CoreTel objects to this interrogatory to the extent it seeks information it has already provided to AT&T. CoreTel further objects to the extent this interrogatory seeks information not relevant to CoreTel's claims or AT&T's defenses or not proportional to the needs of the case.

Subject to and without waiving its objections, please see **Exhibit 3**, attached hereto and incorporated herein by reference. Some customers are listed more than once on **Exhibit 3** because they have multiple unique identifier numbers.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5:**

Subject to and without waiving its objections asserted above, information responsive to this Interrogatory was produced at CORE0020543.

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5:**

Subject to and without waiving its objections asserted above, CoreTel supplements its answer by providing **Exhibit 5**, which contains information responsive to this Interrogatory. **Exhibit 5** supersedes and replaces CORE0020543. Answering further, the unique identifiers 4437470000 and 7177850000 do not correspond to a CoreTel customer but are used to identify 8YY traffic ingressing from CoreTel (so that AT&T has the ability to track which calls are coming from CoreTel). The unique identifier 8149782963 is used temporarily by CoreTel for customers who have not yet been assigned their own unique identifier. The unique identifier 8149782625 is for Affinity Network, Inc. The unique identifier 8149782878 is for Teli Communications, LLC. This is reflected in **Exhibit 5**.

**INTERROGATORY NO. 6:**

For every minute of traffic for which You billed AT&T end office switching access services, identify all grounds on which You relied to conclude that either You or a VoIP partner provided a physical connection to the last-mile facilities used to serve the end user, i.e., the calling or called party, including identifying the VoIP partner providing any functions for which you are billing.

**RESPONSE TO INTERROGATORY NO. 6:**

CoreTel objects to this interrogatory because AT&T has not disputed any of CoreTel's invoices in accordance with the procedures set forth in CoreTel's lawfully filed tariffs. This interrogatory is a clear attempt by AT&T to conjure an after-the-fact justification for AT&T's non-payment, years after the lawful period of lodging a dispute under CoreTel's tariffs has passed. Requiring CoreTel to respond to this interrogatory before AT&T complies with the dispute procedures set forth in CoreTel's tariffs is unduly burdensome on CoreTel. To the extent

to which AT&T had disputes with CoreTel's invoices, AT&T could have invoked the dispute procedures, but failed to do so.

Subject to and without waiving its objections, CoreTel relies on authoritative public telecommunication databases when determining whether it or a VoIP partner provided a physical connection to the last-mile facilities used to serve the end user.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6:**

Subject to and without waiving its objections asserted above, pursuant to a discovery conference with AT&T, CoreTel has agreed to supplement its response to this interrogatory to identify NPAC and the LERG as the authoritative public telecommunication databases referenced above. Using these databases, CoreTel looks up the details in each CDR to determine the nature of the traffic in real time.

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6:**

Subject to and without waiving its objections asserted above, CoreTel supplements its answers as follows. Upon receipt of an 8YY call, CoreTel determines the type of service associated with the calling number by querying the NPAC's live Local Number Portability tables. CoreTel first looks at the "subscriptionSvType" column in the Subscription Version table. If the calling number is not listed, CoreTel next looks at the "numberPoolBlockSvType" column in the PoolBlock table. If the block is not in the pooled table, then it must be a full code, so CoreTel looks at the daily downloads for the NPA NXXs and uses service provider identification files to determine the service provider type.

Within its call detail records, CoreTel classifies the calling number as one of the following types:

| Type | Identification Number |
|---|---|
| Unknown | 0 |
| wireline | 1 |
| wireless | 2 |
| class2InterconnectedVoIP | 3 |
| voWiFi | 4 |
| prepaid-wireless | 5 |
| class1InterconnectedVoIP | 6 |
| Sv-type-6 | 7 |
| Sv-type-7 | 8 |
| Sv-type-8 | 9 |
| sv-type-9 | 10 |
| TollFree | 88 |

The type is recorded by identification number within CoreTel's call detail records in fields "21 cgpn_ilec_ocn" and "22 cgpn_type." CoreTel created the "Tollfree" type, as it is not an NPAC service provider type.

**INTERROGATORY NO. 7:**

Describe the call flow (by call-flow diagram or otherwise) for each of Your Customers, including (a) identification of all carriers and other entities in the call flow between AT&T and the end user and/or calling party, and (b) all equipment that You use to transmit traffic to AT&T, and the functions performed by the equipment.

**RESPONSE TO INTERROGATORY NO. 7:**

CoreTel objects to this interrogatory to the extent it seeks information it has already provided to AT&T. CoreTel objects to this interrogatory to the extent it seeks information already known to AT&T. CoreTel further objects to the extent this interrogatory seeks information not relevant to CoreTel's claims or AT&T's defenses or not proportional to the needs of the case. CoreTel further objects to this interrogatory as it seeks information that would require a call-by-call analysis of every call it transmitted to AT&T and such burdens are not proportional to the claims in this case.

Subject to and without waiving its objections, please see **Exhibit 4**, attached hereto and incorporated herein by reference. This exhibit contains four different call-flow diagrams applicable to CoreTel's customers. CoreTel has identified generally which call-flow diagram(s) apply to each of its customers in Column C on **Exhibit 3**, attached hereto and incorporated herein by reference. It has done so to the best of its ability, relying upon the requirements CoreTel has in its contracts with the customers. Furthering answering, CoreTel adopts by reference and incorporates herein its response to Interrogatory No. 3.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7:**

Subject to and without waiving its objections asserted above, pursuant to a discovery conference conducted between CoreTel and AT&T, CoreTel has agreed to supplement its response to this interrogatory with a network diagram, which has been produced at CORE0016678.

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7:**

Subject to and without waiving its objections asserted above, CoreTel amends and further supplements its response to Interrogatory No. 7 through **Exhibit 6** attached hereto, which contains call flow diagrams A, B and C. Diagram A depicts an over-the-top VoIP call routed to CoreTel from a VoIP partner. Diagram B depicts a facilities-based VoIP call routed to CoreTel from a VoIP partner. Diagram C depicts a call routed to CoreTel from a common carrier. **Exhibit 5** (attached hereto) sets forth the call flow(s) applicable to each CoreTel customer. **Exhibit 5** supersedes and replaces CORE0020543. **Exhibit 6** supersedes and replaces the diagrams included in **Exhibit 4**.

**INTERROGATORY NO. 8:**

For each CoreTel Customer, identify the volume of traffic that You transmitted to AT&T.

**RESPONSE TO INTERROGATORY NO. 8:**

CoreTel objects to this interrogatory as unduly burdensome as answering it would require CoreTel to engage in a complex and time-consuming historical analysis of years of its call detail records. CoreTel objects to this interrogatory to the extent it seeks information it has already provided to AT&T as AT&T has all originating customer information in real-time and thus could assess the volume originating by each entity. CoreTel further objects because it has provided AT&T with information that enables it to ascertain the information sought by this interrogatory. CoreTel further objects to the extent this interrogatory seeks information not relevant to CoreTel's claims or AT&T's defenses or not proportional to the needs of the case.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8:**

Subject to and without waiving its objections, pursuant to a discovery conference conducted between CoreTel and AT&T, CoreTel has agreed to supplement its response to this interrogatory with a report on the requested traffic volumes and has done so at CORE0020540.

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8:**

Subject to and without waiving its objections asserted above, CoreTel supplements its answer through **Exhibit 7** attached hereto. Within **Exhibit 7**, Telco Connection, Telco Connection – 100, Telco Connection – 200 and so on relate to various trunk groups through which Telco Connection delivered 8YY traffic to CoreTel. For purposes of fraud prevention, CoreTel apportioned Telco Connection's 8YY traffic across trunk groups so it could better identify and track the sources (or originators) of the traffic.

9

**INTERROGATORY NO. 10:**

Describe in detail all processes that You used, or any other steps that You took, to avoid billing AT&T for illegal traffic (including but not limited to auto-dialing), including when You implemented such processes or took such steps; the individuals responsible for developing and implementing such processes or taking such steps; Your efforts, if any, to identify illegal traffic, including any algorithms You used to detect and block suspicious traffic; all steps You took in response to such identification or suspicion; and the results of such processes implemented or steps taken.

**RESPONSE TO INTERROGATORY NO. 10:**

CoreTel objects to this interrogatory as overbroad in its use of the terms "all" and "any." CoreTel objects to this interrogatory as unduly burdensome because it asks CoreTel to describe in detail all processes and steps it has taken from 2017 to the present to avoid billing AT&T for "illegal traffic." This would require CoreTel to undergo an exhaustive historical analysis. CoreTel additionally objects to this interrogatory to the extent it seeks information already known or provided to AT&T. CoreTel further objects to this interrogatory as the term "illegal traffic" is vague and undefined. CoreTel will respond to this interrogatory as seeking information concerning processes that CoreTel implements or steps CoreTel takes to avoid billing AT&T for unwanted robocalls and toll-free traffic pumping.

Subject to and without waiving its objections, CoreTel is an industry leader in the fight against unwanted and suspicious robocalls. CoreTel's parent company, Core Communications, Inc., is an active member of the Communications Fraud Control Association (CFCA), participates in regularly scheduled industry calls about trends in robocall mitigation, and closely

coordinates with upstream and downstream carriers to isolate, mitigate and eliminate illegal robocall traffic.

CoreTel utilizes numerous methods to identify and eliminate fraudulent and suspicious 8YY traffic (including but not limited to fraudulent and unwanted traffic that is autodialed) from its network, both proactively and reactively, including:

- Gathering information related to each account as part of new account intake procedures.

- Monitoring new account testing and turn up for signs of suspect traffic.

- Collecting and storing CDRs associated with suspect traffic for subsequent analysis.

- Maintaining Acceptable Use Policy ("AUP") and contractual provisions to ensure ability to block suspect traffic and to suspend and terminate accounts associated with suspect traffic.

- Assigning each account an account-specific profile number, tagging traffic associated with each profile with the corresponding profile number, and monitoring traffic patterns associated with each account profile to identify actual and potential suspect traffic.

- Maintaining a directory of IP addresses from SIP headers for each call in the originating direction, so that IP addresses associated with suspect traffic are more easily tracked and blocked if necessary.

- Periodic calls with downstream carriers to discuss trends and specific incidents of suspect traffic.

- Maintaining direct communication links with law enforcement personnel.

- Attending industry seminars and workshops relating to 8YY fraud prevention to share and learn best practices and recent developments.

- Implementing STIR/SHAKEN Caller ID authentication framework.

- Responding timely to all law enforcement requests and investigating as appropriate.

- Responding timely to all traceback requests and investigating as appropriate.

- Responding timely to all carrier complaints and investigating as appropriate.

Additionally, CoreTel has "Know Your Customer" requirements in place for all of its originating carriers. CoreTel scrutinizes the customer information provided in our contracts and interop forums to try to identify any red flags with regard to company information. This includes extensive research into customers, including, but not limited, to researching related websites, social media accounts, articles of incorporation, and FCC 499 filings. CoreTel at times delves deep into affiliations of potential and actual customers to uncover all persons and entities related to that customer. If the originating carrier does not commit to each of the requirements, CoreTel refuses to accept any traffic from them. Further, if a customer (originating carrier) signs up a customer that starts generating suspicious traffic identified either by CoreTel's own algorithms or from a traceback event, CoreTel notifies the originating carrier and requires blocking/disconnection of the suspicious traffic.  If the originating customer does not take immediate action, CoreTel will proactively take steps to stop suspicious traffic. By way of example, in the summer of 2018, CoreTel identified suspicious traffic coming from one originating carrier, based on traceback chatter. CoreTel successfully worked with AT&T over the following weeks to confirm the source of the traffic and disconnected the originating carrier.

CoreTel obtains all SIP signaling information for each call and stores this information in various formats such as CSV, SQL, and PCAP. This allows for several opportunities to analyze at both a high level and deep packet inspection level to determine the nature of traffic. Some non-standard fields that CoreTel processes in real time including the logging of these more detailed fields such as:

> cgpn - Calling Party Number (CallerID)
>
> cgpn_location_code - the CGPN's location, i.e. Country and when possible the locality, such as state
>
> cgpn_lrn - CGPN lrn in realtime, which allows CoreTel to determine carrier that the numberis currently assigned to a the time of the call

> cgpn_lata - CGPN Lata or location the number is assigned tocgpn_ocn - CGPN lrn OCN (Operating Company Number)
>
> cgpn_type - CGPN type such as 8YY, Wireless, Landline, VoIP
>
> invite_sdp_ip - IP address of the audio source of the call, otherwise known as RTP/SDP source IP address

CoreTel has also instituted technological advancements to identify and block unwanted and suspicious calls. Most recently, CoreTel has added approximately 14 fields relating to tracking of Stir/SHAKEN details so in the event that SS7/TDM leg is present in the call path and the identity header gets stripped out, CoreTel is able to provide these details in the event of a traceback.

CoreTel obtains originating RTP IP (invite_sdp_ip) address information, which is the source of the Audio being passed. In cases where the RTP(Audio) is not proxied by a customer, this provides information to help identify the true originator of the traffic regardless of who is directly passing the traffic to CoreTel. For example, in many cases traffic from the same originating party passes through multiple originating carriers, and this information helps to identify suspect traffic from the same originating party. In several cases, this allowed CoreTel to block originating RTP IP addresses to prevent suspicious calls from being delivered to the IXC/RespORG.

In addition, CoreTel makes every effort to address all concerns and complaints raised by carriers. For example, since 2019, CoreTel has instituted a system whereby additional customer data is inserted in the switch call detail information that CoreTel sends to AT&T such that AT&T can monitor in real time the originator of the call.

These procedures have evolved over time; however, all of them were in place in some form by 2017, when CoreTel began to bill AT&T in connection with originating 8YY traffic. As with the telecommunications industry as a whole, CoreTel has become more proactive over time,

and less dependent on receiving complaints from other carriers. As of now, CoreTel generates daily traffic reports, examines them for anomalies associated with suspect traffic and follows up with the relevant carrier(s). These procedures were designed to prevent suspect and actual fraud and unwanted traffic from reaching AT&T's end-user customers. However, with a handful of exceptions, AT&T has failed to communicate or coordinate directly with CoreTel regarding 8YY fraud prevention generally or in connection with specific incidents of suspect traffic; had AT&T done so, these procedures may have been more effective. AT&T has never filed a billing dispute with CoreTel pursuant to the dispute procedures set forth in CoreTel's tariffs. Accordingly CoreTel has had no opportunity to investigate whether any bill credits may be due to AT&T (or if so, in what amount) in connection with fraudulent and illegal 8YY traffic (including, but not limited to, fraudulent and illegal traffic that is autodialed).

The individuals responsible for developing and implementing these procedures are:

- Bret Mingo: Process design
- Glenn Dalgliesh: Process design and implementation oversight
- Janice Neff: Process implementation
- Jered Morgan: Process implementation

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 10:**

Subject to and without waiving its objections, pursuant to a meet and confer with AT&T, CoreTel has agreed to supplement this interrogatory with the names of the customers it disconnected on the basis of suspicious or unwanted call traffic. Those entities are: Endstream (disconnected on 8/13/2019); Voxon (disconnected on 2/20/2020); Range (disconnected on 2/20/2020); PSTNCall (disconnected 5/20/2021); IPC-LLC (disconnected on 2/4/2020). Documents and communications related to these disconnections have also been produced by

CoreTel on June 22, 2022. Moreover, CoreTel has produced the following information to AT&T on June 22, 2022 concerning the steps CoreTel has taken to block or disconnect suspicious or unwanted traffic:

- Trouble tickets;
- Internal suspect traffic reports;
- CoreTel's Acceptable Use Policy;
- CoreTel's Know Your Customer Policy;
- Internal communications and communications with third parties concerning such traffic;
- Reports of monitoring statistics and suspicious traffic patterns;
- Reports of blocked IP addresses;
- Information related to CoreTel's participation in SOMOS Toll-Free Traffic;
- Information related to CoreTel's participation in the Traceback Group and Communications Fraud Control Association; and
- Documents related to the process by which CoreTel blocks calls with invalid NANPA CGPN.

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 10:**

Subject to and without waiving its objections asserted above, CoreTel supplements its answer as follows.  In addition to the methods described above, CoreTel uses the following to identify and eliminate fraudulent and suspicious 8YY traffic:

- CoreTel runs all 8YY calls through the SOMOS DNO (Do Not Originate) RealNumber Service.  Through this service, CoreTel automatically block calls from known DNO numbers in real time.

- CoreTel use software to monitor trunk groups (customer accounts) for the number of calls made per second to identify patterns associated with suspicious traffic.

- CoreTel runs all 8YY traffic through its CGPN call validation software which automatically blocks calls in real time based on various criteria.  For example, the software blocks call with invalid CGPN formats or from numbers that have not been assigned by the North American Numbering Plan Administrator.

## VERIFICATION

I, Bret Mingo, state as follows:

I am the Chief Executive Officer for plaintiffs Core Communications, Inc., CoreTel Delaware, Inc., CoreTel New Jersey, Inc., CoreTel Virginia, LLC, and CoreTel West Virginia, Inc. (collectively, "CoreTel"). I have read CoreTel's Second Supplemental Responses to AT&T Corp.'s First Set of Interrogatories, and am authorized to execute this verification on its behalf. The information contained in CoreTel's responses is true to the best of my knowledge, information, and belief. As to those matters that are not within my personal knowledge, they are based upon information from persons with knowledge and from the records, correspondence, and other information within the possession of CoreTel.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 16th day of December 2022.

_____
Bret Mingo

Respectfully submitted,

**CORE COMMUNICATIONS, INC., CORETEL DELAWARE, INC., CORETEL NEW JERSEY, INC., CORETEL VIRGINIA, LLC, AND CORETEL WEST VIRGINIA, INC.,**

By: */s/ Lauren J. Coppola*
Lauren J. Coppola (*pro hac vice*)
lcoppola@robinskaplan.com
Timothy Wenger (*pro hac vice*)
twenger@robinskaplan.com
Robins Kaplan LLP
800 Boylston Street, Suite 2500
Boston, MA 02199
(617) 267-2300

Mark D. Bradshaw, Esquire
Attorney I.D. No. 61975
mdb@stevenslee.com
Michael A. Gruin, Esquire
Attorney I.D. No. 78625
mag@stevenslee.com
17 North Second Street, 16th Floor
Harrisburg, PA 17101
(717) 255-7357

Date:  December 16, 2022

**CERTIFICATE OF SERVICE**

    I hereby certify that on December 16, 2022, I caused a copy of Plaintiffs' Second Supplemental Responses to AT&T Corp.'s First Set of Interrogatories to be served on the counsel of record for AT&T Corp.

*/s/ Timothy Wenger*
Timothy Wenger
