IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CORE COMMUNICATIONS, INC. *et al.*,**<br><br>Plaintiffs,<br><br>v.<br><br>**AT&T CORP.,**<br><br>Defendant. | Civil Action No. 2:21-cv-02771-JDW<br><br>Hon. JOSHUA D. WOLSON<br><br>**ORAL ARGUMENT REQUESTED** |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiffs, by and through their undersigned counsel, respectfully submit this Memorandum in Opposition to Defendant's Motion for Summary Judgment. Consistent with the following discussion, or for any other reason that may appear to the Court, Plaintiffs request the entry of an Order which denies Defendant's Motion, and provides for such other and further relief as the Court deems just and proper.

<u>**TABLE OF CONTENTS**</u>

Pertinent Background……………………………………………………………………...1

Standard of Review ...………………………………………………………………..3

Standard of Tariff Interpretation………………………………………………………...3

Argument. .……………………………………………………………………………4

     I.     Defendant has raised a novel defense, which is both untimely and
          without merit………………………………………………………………4

     II.    Under both governing law and pertinent tariffs, Plaintiffs can
          recover access charges from Defendant……………………………………..10

     III.   Defendant's suggestion that Plaintiffs do not service "end users"
          is without merit…………………………………………………………...13

     IV.   The amounts charged by Plaintiffs for end office access services
          are properly compensable…………………………………………………...16

     V.    As a consequence of Defendant's failure to observe
          the dispute resolution procedure of Plaintiffs' tariffs, all of
          AT&T's defenses to non-payment should be disregarded………………………24

Concluding Statement…………………………………………………………………25

## PERTINENT BACKGROUND

Each of the Plaintiffs is a competitive local exchange carrier ("CLEC"), (see Ans., ECF No. 34, at ¶¶ 10-14), and therefore, may file interstate switched access service tariffs with the FCC, and intrastate tariffs with pertinent state regulatory agencies, see, e.g., In re Core Commc'ns, Inc., 36 FCC Rcd. 9997, at ¶ 2 (2021); see also In re Connect America Fund, 26 FCC Rcd. 17663, at ¶ 776 (2011). They have done so, and those tariffs are presently in dispute and a part of the record. (ECF Nos. 92.48-53.) Since each of the tariffs is substantially the same, when referring to both the interstate and intrastate tariffs, Plaintiffs will cite only to the interstate tariff, which is filed with the FCC.

Each of the Plaintiffs serves as an intermediate provider to facilitate the transmission of telecommunications traffic between originating callers and 8YY, or toll free, service providers, including Defendant. Core Commc'ns, 36 FCC Rcd. 9997, at ¶ 2; (see also Statement of Undisputed Facts, referred to hereinafter as "**SOF**," ECF No. 91, at ¶¶ 9 & 11-12). Regardless of the data format in which the 8YY calls may originate, Plaintiffs receive each of these voice calls in "IP"—or internet protocol—format, and transfer the calls in IP format. (SOF, ECF No. 91, at ¶ 19.) Ultimately, when each call is delivered to Defendant, it is received in "TDM"—or time division multiplexing—format, (id. at ¶ 21), which is the traditional method of transmitting and receiving voice signals over the "PSTN"—or public switched telephone network. Cf. Teliax, Inc. v. AT&T Corp., 220 F. Supp. 3d 1094, 1096 (D. Colo. 2016) (citation omitted).

Upon receipt of an 8YY call, and pursuant to their tariffs, each Plaintiff performs a toll-free database query to determine which "IXC"—or interexchange carrier—the call should be sent

to in order to connect with the intended recipient.  <u>See, e.g.</u>, <u>id.</u> at 1097;[1] (<u>see also</u> SOF, ECF No. 91, at ¶ 17).  Each Plaintiff then delivers these 8YY calls to the proper IXC, which is the class of carrier to which Defendant belongs.  <u>See</u> <u>Teliax</u>, 220 F. Supp. 3d at 1097; (<u>see also</u> SOF, ECF No. 91, at ¶ 17).  The calls that form the substance of this dispute are 8YY calls routed by Plaintiffs to AT&T.

No Plaintiff delivers these calls directly to AT&T.  Instead, each Plaintiff routes these calls to a further intermediary—known as a "tandem"—which is operated by a third-party carrier.  (<u>See</u> SOF, ECF No. 91, at ¶¶ 19-21.)

With respect to compensation, and in relevant part, Plaintiffs assess charges under their tariffs to the IXCs, including AT&T, that are in the calling party's intended call path.  These charges are defined in Plaintiffs' tariffs, and are generally referred to as "switched access service" charges.

During 2018, Defendant began withholding payment from Plaintiffs with respect to 8YY traffic.  Initially, AT&T would remit only partial payment to Plaintiffs, (<u>see, e.g.</u>, ECF No. 92-45), contending that "virtually 100%" of the 8YY traffic that Plaintiffs were routing to Defendant was unwanted, if not fraudulent, (<u>see</u> SOF, ECF No. 91, at ¶ 35; <u>see also</u> ECF No. 92.42 & 92.43).  However, by 2020, Defendant had began withholding substantially all payments which Plaintiffs claimed to be owed for their participation in the 8YY telecommunication services call path.  This action was commenced on June 22, 2021.

---

[1] "Upon receipt of these calls, Teliax performs a database query ("DBQ") to determine to which carrier the caller intended the call ultimately to go.  Teliax then delivers these 8YY calls to the proper interexchange carrier ("IXC") . . . ."  <u>Teliax</u>, 220 F. Supp. 3d at 1097 (internal citations omitted).

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" Scott v. Harris, 550 U.S. 372, 378 (2007) (quotation omitted). However, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact. Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted). The movant is entitled to judgment as a matter of law when the non-moving party fails to make such a showing. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

## STANDARD OF TARIFF INTERPRETATION

"Tariffs . . . are interpreted according to federal common law," and their "interpretation largely follows the rules of contract construction." Broadvox-CLEC, LLC v. AT&T Corp., 184 F. Supp. 3d 192, 201 (D. Md. 2016) (citation omitted). "When a tariff is clear and unambiguous on its face, no construction by the court is necessary, and the parties are bound by its terms." Verizon Va., LLC v. XO Commc'ns, LLC, 144 F. Supp. 3d 850, 858 (E.D. Va. 2015) (citation omitted). This circumstance leaves the Court "with no ambiguities to construe but only terms to enforce." Broadvox-CLEC, 184 F. Supp. 3d at 206 (citation omitted).

<u>**ARGUMENT**</u>

**I.    DEFENDANT HAS RAISED A NOVEL DEFENSE, WHICH IS BOTH UNTIMELY AND WITHOUT MERIT.**

In what appears to be the first time in this case, Defendant has raised a new defense intended to justify AT&T's refusal to simply pay its bills.  That defense is this: none of Plaintiffs' tariffs are enforceable.

The assertion of this defense is not obvious; it is deftly obscured in Defendant's first argument section—that Plaintiffs cannot recover access charges from AT&T because Plaintiffs received and transmitted all their traffic in IP format.  (Def.'s Memo. Supp. Mot. Summ. Judg., referred to hereinafter as "**Def.'s Memo. Supp.**," ECF No. 93-1, at 9-12.)  In the course of this argument, Defendant quotes <u>In re</u> <u>Teliax Colorado, LLC</u>, 36 FCC Rcd. 8285 (2021), for the assertion that "[c]harges for IP traffic that never touch[] the PSTN may not be tariffed."  (Def.'s Memo. Supp., ECF No. 93-1, at 10.)  This excerpt is misleading; it does not reflect the law regarding compensation due intermediate carriers in a VoIP-PSTN call path, like Plaintiffs; and it is neutered by Defendant's own admissions.  <u>See</u> <u>Connect America</u>, 26 FCC Rcd. 17663, at ¶ 940 (defining "VoIP-PSTN" traffic).

<u>In re</u> <u>Teliax Colorado, LLC</u> is a 2021 FCC decision.  The specific issue in this case was the validity of an interstate tariff revision that Teliax had filed with the FCC, and which had drawn timely objections from several other carriers, AT&T included.  In relevant part, the complainants asserted that Teliax's proposed revisions established a tariff structure that could allow Teliax to bill for traffic "that is purely IP-IP and does not touch the PSTN."  <u>Teliax</u>, 36 FCC Rcd. 8285, at ¶ 8.  Simply stated, under the language of the proposed tariff, it was possible for Teliax to charge fees for services rendered in the course of a call that originated in IP, was transmitted exclusively in IP, and received by the call recipient in IP, without any portion of the call path touching

traditional telecommunications facilities (i.e. the PSTN). This circumstance, as the FCC remarked, is "outside of the regulated intercarrier compensation regime" established by the Communications Act of 1934. Id. at ¶ 8. "Only IP traffic 'exchanged over PSTN facilities' is subject to the intercarrier compensation regime." Id. at ¶ 9. Accordingly, because the FCC determined that Teliax was attempting to file a tariff that contained a provision beyond the scope of the Commission's regulatory authority, the entire tariff revision was rejected. Id. at ¶ 10.

It is not disputed that, with respect to the traffic that Plaintiffs routed to AT&T, the entirety of such traffic was received by Plaintiffs in IP, and it was passed along by Plaintiffs in IP. (SOF, ECF No. 91, at ¶ 19.) Defendant is suggesting, however, that this circumstance alone renders all traffic routed by Plaintiffs uncompensable. And that is just not the case.

In 2011, the FCC issued In re Connect America Fund, 26 FCC Rcd. 17663 (2011), which comprised a report, order, and notice of proposed rulemaking to address the reality of the shift in American telecommunications from physical facilities to those which are internet enabled; this is also known as "**the Transformation Order**." The Transformation Order explains that, traditionally, telecommunications services were conducted over physical circuit-switched networks. Id. at ¶ 62. The voice functionalities involved in circuit-switched telecommunications were transmitted in TDM format. Id. at ¶ 77 n. 112. This particular data format facilitated the transmission and receipt of voice signals over the PSTN. Id. TDM format and the PSTN are legacy technologies that, while dominant in the telecommunications industry, are quickly becoming obsolete due to the technological efficiencies that IP enables.

This circumstance was not lost on the FCC. In the Transformation Order, the Commission explained, in no uncertain terms, that its policy was to facilitate the transition of American telecommunications infrastructure from inefficient legacy technologies to IP. Id. at ¶ 16.

The FCC's shift in focus was also driven by changing patterns among the public in their use of telecommunications services. "Increasingly . . . consumers are obtaining voice services not through traditional means but instead through interconnected VoIP providers offering service over broadband networks." Id. at ¶ 63.

Accordingly, it has become the policy of the FCC that the American telecommunications infrastructure should work toward the goal of implementing networks that are entirely IP-based. See id. at ¶ 741; see also In re Connect America Fund, 34 FCC Rcd. 12692, at ¶ 4 (2019).

This, of course, could not happen overnight. To that end, the Transformation Order was issued to help transition a legacy industry like telecom into a more modern era. Prior to the Transformation Order's issuance in 2011, the introduction of IP-format and VoIP enabled communication resulted in frequent and "costly litigation" among carriers "over payment, jurisdiction, and type of traffic." Transformation Order, 26 FCC Rcd. 17663, at ¶ 930. The Transformation Order aimed to reduce the incidence of those inefficiencies, id., but clearly, it achieved only modest success.

Regardless, it is important to acknowledge the developmental history of America's telecom infrastructure to understand the importance of the Transformation Order. As noted above, the traditional means by which a telephone call was transmitted involved the initiation of the call by the calling party in TDM format over the PSTN, which would be subjected to physical call-switching through various carriers as the call made its way to its destination, to ultimately be delivered in TDM format to the recipient.

The advent of voice over internet protocol—or VoIP—changed the traditional model of telecom traffic. In some cases, which came to be known as "IP-in-the-middle," calls were initiated and received in the traditional format, but along the call path, were transmitted into and out of IP.

See, e.g., S.W. Bell Tel., LP v. Vartec Telecom, No. 4:04-cv-1303, 2008 WL 4948475, at *2 (E.D. Mo. Nov. 10, 2008) (unpublished decision) (cited solely for the purpose of evidencing the use of the term "IP-in-the-middle," which arose from the FCC decision In re Vonage Holdings Corp., 19 FCC Rcd. 7457 (2004)).  In other cases, calls were originated in IP format, but were translated into TDM format over the PSTN prior to delivery; or, alternatively, calls were originated traditionally, but delivered in IP.  See Transformation Order, 26 FCC Rcd. 17663, at ¶ 940 (describing such calls as "VoIP-PSTN" traffic).  And in still other cases, calls were originated in IP format, transmitted entirely in IP format, and delivered in IP format.  See Teliax Colorado, 36 FCC Rcd. 8285 (describing such calls as "purely IP-IP" traffic).

Defendant's position has heavily relied on the Teliax decision, which is surprising since the case is wholly inapposite.  Not only is the traffic flow in Teliax different than what is present in this case, the defects that invalidated Teliax's proposed tariff revisions are absent from Plaintiffs' tariffs.  Page 94 of Plaintiffs' interstate tariff, (ECF No. 92-5), expressly limits Plaintiffs' ability to assess charges for IP-transmitted communications to those which are permissible under the FCC's standards, including those for VoIP-PSTN traffic, and limits the rates chargeable to VoIP-PSTN traffic to that permitted by applicable federal law.  (Id. at 94, at §§ 7.1, 7.2 & 7.3.)  It is therefore hard to see the relevance that Teliax has to the case before the Court.

In any event, the historical development of the types of call-transmission methods is necessary to understand which type of call traffic is subject to FCC regulation under the Communications Act of 1934, and which is not.  Because, ultimately, this determines the validity of a tariff.

There should be no doubt but that the traditional method of call delivery—initiation in TDM, translation through physical switching in the PSTN, and delivery in TDM—is subject to

FCC regulation.  So is "IP-in-the-middle."  See Vonage Holdings, 19 FCC Rcd. 7457.  And, as established by the Transformation Order, so is VoIP-PSTN traffic.  26 FCC Rcd. 17663, at ¶ 940. In fact, the only means of call transmission that is not subject to FCC regulation through the Communications Act is purely IP-IP traffic.  Teliax Colorado, 36 FCC Rcd. 8285.

This is an important point.  Defendant has argued that the traffic Plaintiffs routed to AT&T is "IP traffic that never touches the PSTN."  (Def.'s Memo. Supp., ECF No. 93-1, at 10.)  This is simply not true.

The Transformation Order defines VoIP-PSTN traffic as "traffic exchanged over PSTN facilities that originates and/or terminates in IP format."  26 FCC Rcd. 17663, at ¶ 940.  Defendant seems to (at least implicitly) suggest that, for the purposes of this definition, the Court focus on Plaintiffs' specific participation in the call path, as opposed to what the definition actually emphasizes, which is "traffic."  According to the plain language of the definition, any and all "traffic" that originates and/or terminates in IP format, and which is exchanged over PSTN facilities, is VoIP-PSTN traffic, and it is all subject to FCC jurisdiction.  Id. at ¶ 933.

Furthermore, it is undisputed that Plaintiffs "receive[] toll-free calls over the public Internet in IP format and then route[] the calls over the public Internet in IP format to a tandem provider." (SOF, ECF No. 91, at ¶ 19.)  Later, "one of [Plaintiffs'] Third Party Tandem Providers convert[s] the calls from IP format and exchange[s] them with AT&T over the PSTN."  (Def.'s Memo. Supp., ECF No. 93-1, at 10.)  Based on these admissions alone, Defendant must necessarily concede that the traffic at issue in this lawsuit is either VoIP-PSTN or IP-in-the-middle.  If, under these circumstances, a call that Plaintiffs route to AT&T is originated in traditional format, then it would be IP-in-the-middle; if, alternatively, the call were to originate in IP, then it would be VoIP-PSTN.

Ultimately, the distinction is irrelevant.  Regardless of whether traffic routed by Plaintiffs to AT&T is IP-in-the-middle or VoIP-PSTN, the Commission has held consistently that both types of traffic are subject to the FCC's regulatory authority under the Communications Act.  And, because both types of traffic are subject to the FCC's regulatory authority, Plaintiffs—as LECs— may file tariffs with state and federal regulatory authorities to govern their compensation in the intercarrier exchange regime.  See Transformation Order, 26 FCC Rcd. 17663, at ¶¶ 15 & 961. Unless the tariffs are invalidated by a regulatory or third-party challenge lodged within fifteen (15) days after filing, they are allowed to go into effect and are "deemed lawful." 47 U.S.C. § 204(a)(3). At that point, a carrier is obligated to honor the tariff and to pay the access charges imposed.

As an interesting aside, Plaintiffs' interstate tariff went into effect on January 1, 2011. (See ECF No. 92-5.)  It was revised several times between then and 2020, including twice while the parties to this dispute were actively doing business with each other.[2]  Defendant never took these opportunities to challenge the tariff or its revisions.  Certainly, AT&T knows how.  On April 22, 2021, Plaintiffs filed a proposed revision to the interstate tariff, see Core Commc'ns, 36 FCC Rcd. 9997, at ¶ 8; on April 28, Defendant filed a challenge with the FCC as to the revision, id. at ¶ 9; on June 22, Plaintiffs commenced this action, (Compl., ECF No. 1); and one day later, June 23, the FCC announced its decision to move forward with an investigation of Plaintiffs' tariff revisions, Core Commc'ns, Inc., 36 FCC Rcd. 9997.

Regardless, Defendant's insinuation that Plaintiffs' tariffs are invalid is without merit.  It is also untimely.  In Paragraphs 18 & 19 of the Complaint, Plaintiffs alleged that their interstate and intrastate tariffs governing access services were valid.  (Compl., ECF No. 1, at ¶¶ 18 & 19.)

---

[2] July 14, 2017 and July 17, 2019.  (See, e.g., ECF No. 92-5, at 66 ("CORE0012396") and 72 ("CORE0012402").)

Defendant did not deny the validity of the tariffs.  (Cf. Ans., ECF No. 34, at ¶¶ 18 & 19.)  Nor did Defendant assert any affirmative defense that suggests the invalidity of any tariff.  (See Ans., ECF No. 34, at 8-11 (enumerating affirmative defenses).)

Therefore, to the extent that Defendant has even implicitly suggested that Plaintiffs' tariffs ought to be deemed invalid, those efforts must be rejected.  To the contrary; Plaintiffs' tariffs are "deemed lawful," 47 U.S.C. § 204(a)(3), and they enjoy "a conclusive presumption of reasonableness" and validity with respect to the charges assessed, ACS of Anchorage, Inc. v. FCC, 290 F.3d 403, 411 (D.C. Cir. 2002) (citation omitted).

## II.   UNDER BOTH GOVERNING LAW AND PERTINENT TARIFFS, PLAINTIFFS CAN RECOVER ACCESS CHARGES FROM DEFENDANT.

Defendant contends that Plaintiffs "cannot recover access charges from AT&T," (Def.'s Memo. Supp., ECF No. 93-1, at 9), allegedly because all of the traffic routed from Plaintiffs to AT&T was "IP-IP," "never touch[ing] the PSTN," (id. at 10).

As explained in the preceding section, this is demonstrably false.  Regardless, this argument provides an opportunity for Plaintiffs to introduce the Court to "the VoIP Symmetry Rule."  In a key portion of the Transformation Order, 26 FCC Rcd. 17663, at ¶¶ 968-70, the Commission adopted the VoIP Symmetry Rule, which was intended to help providers of IP-enabled telecommunications services remain competitive with traditional telecom service providers, specifically by allowing the former to recover access charges if they perform functions equivalent to those performed by traditional telephone carriers.  The Symmetry Rule was codified as a formal FCC regulation at 47 C.F.R. § 51.913.  And, despite its importance to this case, as well as the broader intercarrier compensation system, the Court will not find the word "symmetry" anywhere in Defendant's memorandum.

It has been conclusively admitted that each Plaintiff is an LEC.  Furthermore, it is the position of the FCC that the "transitional intercarrier compensation framework for VoIP-PSTN traffic"—established by the Transformation Order—"applies to all LECs, including LECs that are wholesale partners of VoIP providers."  <u>See</u> Transformation Order, 26 FCC Rcd. 17663, at ¶ 943 n. 1901.  The FCC has never excluded intermediate LECs utilizing IP format exclusively from the intercarrier compensation regime; there is no such exclusionary language in the Transformation Order, nor in any other decision of the FCC.  And, significantly, Defendant has not cited to any authority that establishes the existence of such a proposition.

In fact, the FCC's long-standing position on this matter is just the opposite of what Defendant has asserted.  The FCC has concluded that § 251(b)(5) of the Communications Act "applies to traffic that traditionally has been classified as access traffic. . . . By the express terms of section 251(b)(5), therefore, when a LEC is a party to the transport and termination of access traffic, the exchange of traffic is subject to regulation under the reciprocal compensation framework."  Transformation Order, 26 FCC Rcd. 17663, at ¶ 762.

Defendant has cited to 47 C.F.R. § 51.913(a)(1)-(2) in support of its assertion that only the carriers who directly participate in switching a call from IP format to TDM are eligible for compensation under the intercarrier compensation regime.  Plaintiffs would encourage the Court to read further, specifically to Subparagraph (b), which is quoted at length:

> [A] local exchange carrier shall be entitled to assess and collect the full Access Reciprocal Compensation charges prescribed by this subpart that are set forth in a local exchange carrier's interstate or intrastate tariff for the access services defined in § 51.903 regardless of whether the local exchange carrier itself delivers such traffic to the called party's premises or delivers the call to the called party's premises via contractual or other arrangements with an affiliated or unaffiliated provider of interconnected VoIP service, as defined in 47 U.S.C. § 153(25), or a non-interconnected VoIP service, as defined in 47 U.S.C. § 153(36), that does not itself seek to collect Access Reciprocal Compensation charges prescribed by this subpart for that traffic. . . . For purposes of this provision, functions provided by a

> LEC as part of transmitting telecommunications between designated points using, in whole or in part, technology other than TDM transmission in a manner that is comparable to a service offered by a local exchange carrier constitutes the functional equivalent of the incumbent local exchange carrier access service.

47 C.F.R. § 51.913(b).

The term "Access Reciprocal Compensation" is defined as "telecommunications traffic exchanged between telecommunications service providers that is interstate or intrastate exchange access, information access, or exchange services for such access, other than special access." 47 C.F.R. § 51.903(h). "Telecommunications . . . means the transmission, between one or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." 47 U.S.C. § 153(43). "Telecommunications Service . . . mean[s] the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available to the public, regardless of the facilities used." Id. § 153(46).

"Access service" is also a defined term, which "includes services and facilities provided for the origination or termination of any interstate or foreign telecommunication." 47 C.F.R. § 69.2(b). The types of compensable "access services" are enumerated in 47 C.F.R. § 51.903, which, in relevant part, contemplate "end office access service," "tandem-switched transport access service," "toll free database query charge," and "toll free call." Importantly, the definition of "end office access service" includes "[t]he routing of interexchange telecommunications traffic to or from the called party's premises, either directly or via contractual or other arrangements with an affiliated or unaffiliated entity, regardless of the specific functions provided or facilities used," as well as their "functional equivalent[s]." Id. § 51.903(d)(2)-(3).

Defendant has asserted that Plaintiffs' participation in the 8YY call path does not constitute "access service," and therefore, nothing that Plaintiffs do is compensable. The law says otherwise.

Each of the Plaintiffs is a LEC.  Under 47 C.F.R. § 51.913(b), <u>supra</u>, Plaintiffs are entitled to assess and collect all Access Reciprocal Compensation charges set out in their tariffs, if those charges are also of the type enumerated in 47 C.F.R. § 51.903.  Plaintiffs' federal tariff specifically identifies five (5) types of activities under the umbrella of "switched access service" that Plaintiffs may charge for.  (ECF No. 92-5, at 55-56, §§ 3.3.1 – 3.3.5.)  Because Plaintiffs are in the business of routing phone calls, these services constitute "telecommunications."  And, because Plaintiffs are compensated for their participation in facilitating telephone traffic that is available to the public generally, these are "telecommunications services."  Accordingly, Plaintiffs are engaged in business activity that is regulated by the FCC through the Communications Act, and are empowered to file interstate and intrastate tariffs that govern the compensation due for their participation in the national communications infrastructure.

## III. DEFENDANT'S SUGGESTION THAT PLAINTIFFS DO NOT SERVICE "END USERS" IS WITHOUT MERIT.

Defendant contends that Plaintiffs cannot collect any access charges for any 8YY traffic sent to AT&T because Plaintiffs did not route the call to an "end user."  This is so, Defendant contends, because: (1) an "end user" must pay the carrier a fee for the service utilized; and (2) Plaintiffs do not provide telecommunications services.

Defendant's first argument is premised on what appears to be a deliberate misconstruction of the FCC's decision in <u>Qwest Commc'ns Co. v. Northern Valley Commc'ns, LLC</u>, 26 FCC Rcd. 8332 (2011).  This case presented a challenge to a tariff revision proposed by Northern Valley, in which Northern Valley—a LEC—sought to amend its tariff to expand the definition of "end user." Under its prior tariff, the LEC defined "end user" as "any Customer of an Interstate or Foreign Telecommunications Service that is not a carrier."  <u>Id.</u> at *2.  This is consistent with the regulatory definition of "end user."  <u>See</u> 47 C.F.R. § 69.2(m).  However, with the advent of conference calling

services, the LEC began routing inbound calls for conference bridges established with a telephone number in the LEC's area of operation.  Accordingly, the LEC proposed to amend its definition of "end user" to provide that such a user "need not purchase any service provided" by Northern Valley.  Qwest Commc'ns, 26 FCC Rcd. 8332, at *2.  Were this proposed revision accepted, the LEC would have had a claim to assess tariffed access charges against IXCs for terminating inbound calls with the conference call-in bridge.  However, Qwest prevailed in its challenge, arguing successfully that this amendment would have allowed the LEC to bill tariffed access service charges to IXCs, even if the LEC were to offer telecommunications services to its customers at no charge.  Id. at *4.

This observation is what led the Commission to author the quote that Defendant has relied upon in its memorandum, reproduced here without Defendant's alteration: "[Northern Valley's] Tariff therefore is unlawful, because, as explained below, the Commission's access service rules and orders establish that a CLEC may tariff access charges only if those charges are for transporting calls to or from an individual or entity to whom the CLEC offers service for a fee."  Id. at *4-5.  Defendant misconstrued this excerpt by errantly suggesting that the FCC defines an "end user" only as an individual or entity who pays for the LEC's services.  (Def.'s Memo. Supp., ECF No. 93-1, at 13.)

As addressed above, "end user" is defined as "any customer of an interstate or foreign telecommunications service . . . ."  47 C.F.R. § 69.2(m).  "Telecommunications service," also as discussed above, requires "the offering of telecommunications for a fee."  47 U.S.C. § 153(46).  Therefore, implicit in the definition of "end user" is the notion of an exchange of services for compensation.  Northern Valley's tariff was held unlawful specifically because it created an opportunity for a LEC to provide services to a calling party, for an ordinary toll call, without that

party having to pay any fees, but allowing Northern Valley to nonetheless assess tariff charges against an IXC for that calling party's toll traffic.

That is not the circumstance before the Court. It cannot be forgotten that the type of traffic involved in this case is 8YY—toll free—traffic. "Toll free" does not mean "free of charge;" it means only that the call is free for the party initiating the call. The call is ultimately paid for by the call recipient, who has established a "toll-free" number specifically to invite telephone traffic. In this specific case, Defendant enrolled a number of its customers in AT&T's toll-free exchange service, and is paid by those customers for that service. And, much to Defendant's apparent chagrin, the participants in the call path that ultimately connected the calling party with AT&T's toll-free customer are entitled to be paid for their services, by tariff or other intercarrier agreement.

This arrangement is consistent with Plaintiffs' tariffs. (ECF No. 92-5.) Section 3.1.1 provides that "Switched Access Service is available to Customers for their use in furnishing service to Customers' End Users." "Customer" is defined as "[a]ny person, firm, corporation or other entity which orders Switched Access Service or any other Service provided pursuant to this Tariff, and is responsible for the payment of charges and for compliance with the Company's rate sheet regulations. The Customer could be an interexchange carrier, a wireless provider, or any other carrier. The Customer is responsible for the payment of charges associated with any Switched Access Service or other Service it uses, and for compliance with the terms and conditions of this Tariff." (Id. at 9 (stamped FCC1508).) "Customer End User" is defined as "[a]ny person, firm, partnership, corporation or other entity that subscribes to or otherwise uses the long distance, toll or other communications services of the Customer." (Id.) "The Customer is responsible for payment of all charges for Services provided pursuant to this tariff." (Id. § 2.10.1.) "All charges

due from the Customer are payable to the Company or any agent duly authorized to receive such payment." (Id. § 2.10.3(A).)

Very simply, Defendant offered to provide toll-free exchange services to its customers; Defendant's customers paid for that service; and, under the applicable tariffs, Defendant must pay Plaintiffs for their participation in the call path.

Defendant's second argument—that Plaintiffs do not provide "telecommunications services"—is equally unavailing. Plaintiffs have addressed this argument in the preceding section. To summarize: Plaintiffs are LECs; they provide "telecommunication services;" they are authorized to file tariffs; the tariffs at issue in this dispute are deemed lawful; each of Plaintiffs' tariffs incorporate the VoIP Symmetry Rule; and therefore, regardless of whether the 8YY traffic at issue is considered VoIP-PSTN or IP-in-the-middle, Plaintiffs are entitled to be paid in conformity with their tariffs for the access services provided.

## IV. THE AMOUNTS CHARGED BY PLAINTIFFS FOR END OFFICE ACCESS SERVICES ARE PROPERLY COMPENSABLE.

Defendant contends that Plaintiffs cannot collect "end office access services" from AT&T because: (1) their tariffs do not permit such charges; (2) the FCC's regulations prohibit such charges; and (3) Plaintiffs cannot prove that such services were provided. (Def.'s Memo. Supp., ECF No. 93-1, at 16-24.) None of these contentions is availing.

As an initial observation, Plaintiffs would like to draw attention to the access services that Defendant is not contesting. The pertinent tariffs name multiple activities that comprise "switched access services;" "end office access services" is but one. (See ECF No. 92-5, § 3.3, at 55-56.) Defendant is apparently not challenging Plaintiffs' tariffs for "switched transport" service, "toll-free 8YY data base access service," or "toll free interexchange delivery service." (Id.)

With regard to end office access services, Defendant seems to argue that, under applicable law, Plaintiffs cannot charge for such services unless they are provided to an end user; and, since Plaintiffs don't provide services directly to an end user (or so it is alleged), Plaintiffs cannot charge for end office access services.

As discussed previously, "end user" is defined broadly as "any customer of an interstate or foreign telecommunications service . . . ."  47 C.F.R. § 69.2(m).  Accordingly, in every telephone call, there are at least two end users: the party making a call, and the party taking the call.

In similar fashion, Plaintiffs' tariffs identify two types of end users: "Company End Users" and "Customer End Users."  (ECF No. 92-5, at 8-9 ("CORE0012338-39").)  A "Customer" is "[a]ny person, firm, corporation or other entity which orders Switched Access Service or any other Service provided pursuant to this Tariff, and is responsible for the payment of charges and for compliance with [Plaintiffs'] rate sheet regulations.  The Customer could be an interexchange carrier, a wireless provider, or any other carrier." (Id. at 9 ("CORE0012339").)  And a "Customer End User" is "[a]ny person, firm, partnership, corporation or other entity that subscribes to or otherwise uses the long distance, toll or other communications services of the Customer." (Id.)

By contrast, a "Company End User" is "[a]ny person, firm, partnership, corporation or other entity (including, where applicable, a Carrier) that subscribes to or otherwise uses the local exchange or other telecommunications services of [Plaintiffs]."  (Id. at 8 ("CORE0012338") (emphasis added).)  There is no requirement of direct contractual privity between any Plaintiff and a Company End User.  The term "includes, without limitation, wholesale customers, Internet service providers ("ISPs"), interconnected VoIP service providers, non-interconnected VoIP service providers, conference call providers, chat line providers, calling card providers, call centers, enhanced service providers, help desk providers, and residential and/or business users."

(Id.)  Accordingly, under the definition of "Company End User" set out in Plaintiffs' tariffs, the initiator of any 8YY call that comes across Plaintiffs' network—no matter how remote—is a Company End User.

The applicable tariffs provide that "Switched Access Service is available when originating or terminating calls from or to a Company End User."  (Id. § 3.2.1, at 54.)  The rate categories and elements that comprise "Switched Access Service" are set out in § 3.3.  (Id. at 55.)  Section 3.3.3 pertains to the "end office" rate category.  (Id.)  It provides as follows:

> The End Office access service category includes: (1) The switching of calls at the Company's End Office Switch and the delivery of such calls to or from the called party's premises; (2) The routing of calls to the called party's premises, either directly or via contractual or other arrangements with an affiliated or unaffiliated provider of interconnected VoIP service or a non-interconnected VoIP service that does not itself seek to collect switched access charges, regardless of the specific functions provided or facilities or technology used; or (3) Any functional equivalent of the incumbent local exchange carrier End Office access service provided by the Company via analogous services.

(Id. (emphasis added).)

In short, "end office access service" describes call switching, call routing, or their functional equivalents.  And this is consistent with the regulatory definition of "end office access service," which means "[t]he routing of interexchange telecommunications traffic to or from the called party's premises, either directly or via contractual or other arrangements with an affiliated or unaffiliated entity, regardless of the specific functions provided or facilities used," as well as their "functional equivalent[s]."  47 C.F.R. § 51.903(d)(2)-(3).

Nowhere in these definitions or regulatory provisions is it stated that any Plaintiff must be in immediate adjacency in the call path with any specific end user in order to assess tariffed access charges for the use of Plaintiffs' network.

This is exceedingly problematic for AT&T.  The assertion that no Plaintiff has any end user is patently false.  (See Def.'s Memo. Supp., ECF No. 93-1, at 17.)  Defendant acknowledges the undisputed fact that 8YY calls were routed through various Plaintiff entities for ultimate delivery to AT&T's customers.  (SOF, ECF No. 91, at ¶ 21.)  It is also patently false that "end users do not 'receive' any 'local exchange or telecommunications service'" from Plaintiffs.  (See Section II, supra, regarding the legal definitions of "telecommunications" and "telecommunications service.")

In fact, there appears to be only one circumstance when immediate adjacency to an end user matters at all to the intercarrier compensation regime, and it is inapplicable to this dispute: it is when an LEC intends to assess end office switching charges for over-the-top VoIP-PSTN traffic. Despite the optimism of the 2011 Transformation Order and the VoIP Symmetry Rule, compensation disputes among carriers regarding VoIP traffic carried on.  A significant battleground in these disputes pertained to the ability of LECs (or VoIP-LEC partnerships) to bill end office switching charges for VoIP traffic received from, or delivered to, a party who received their VoIP service from a provider who was different than the provider of internet service.  Because of the difference in service providers, the VoIP service was "over-the-top" of the internet connection.  In 2019, the FCC concluded that LECs (or VoIP-LEC partnerships) that delivered traffic to, or received traffic from, an immediately adjacent end user through over-the-top service could not collect a fee for end office switching.  In re Connect America Fund, 34 FCC Rcd. 12692, ¶ 14 (2019).

> [W]e reaffirm the long-standing definition of what constitutes "end office switching."  A VoIP-LEC partnership that interconnects a call with a customer's last mile facility performs the functional equivalent of end office switching and may charge for that functionality.  By contrast, a VoIP provider, or a VoIP-LEC partnership, that transmits calls to an unaffiliated ISP for routing over the Internet does not provide the functional equivalent of end office switching, and may not

impose an end office switching access charge on IXCs that receive or deliver traffic to or from the VoIP-LEC partnership.

Id. (citation omitted).

Importantly, it does not appear that the FCC considers "end office switching" to be synonymous with "end office switched access service." Instead, the FCC's position appears to be that "end office switching" is but one element of the rate category "end office access service," which itself is but one component of "switched access service."

In support of this proposition, Plaintiffs would draw the Court's attention to In re CenturyLink Communications, LLC, FCC No. DA-23-261 (2023), a case in which the FCC examined the ability of a LEC to charge for over-the-top VoIP-PSTN traffic. The case suggests that the LEC was in partnership with a VoIP provider, and that this partnership was in direct privity with its end user. Id. ¶ 13. The LEC was also assessing tariffed "end office switching" charges for the end office switching service.

The most substantial part of the FCC's analysis—in invalidating the LEC's charges—was focused on the specific language of the LEC's tariff. Specifically, "end office switching" is identified as a rate category for "switched access service." Id. at ¶ 5. It was described as "provid[ing] the local end office switching functions necessary to complete the transmission of Switched Access communications to and from the end users served by the local end office and the Customer." Id. Critically, there was no component of this provision that allowed for the LEC to charge for services that were functionally equivalent to "switching." Id. at ¶ 13. The "end office switch" was defined as the traditional "telephone switching system established to provide local exchange service and/or exchange access service." Id.

The FCC's analysis begins by calling back to the 2019 order referenced above, observing that "[t]he physical connection to the last-mile facilities used to serve an end user is the key

characteristic of end office switching.  Absent this physical connection, a VoIP-PSTN partnership is not performing the functional equivalent of end office switching.  Thus, LECs are not permitted to tariff or assess end office switched access charges for OTT-VoIP traffic."  Id. at ¶ 4.  This could have been the end of the Commission's analysis.  But it wasn't.  The FCC went on to suggest that the LEC could have billed for its services if only it had included language in the tariff that contemplated the provision of services that were functionally equivalent to "end office switching." Id. at ¶ 13 & n.61.  In short, apparently, to bill for end office switching for over-the-top VoIP services, the carrier must have a direct interconnection with the end user's physical telecommunications facilities; alternatively, apparently, if the carrier has included language in its tariff regarding functional equivalence, it may bill for something like "end office switching" without any need for a last-mile physical interconnection.  See id. ¶ 14 ("[A] LEC's ability to assess end office charges for VoIP-PSTN traffic is dependent on 'applicable tariff language [that] contemplates charging for functionally equivalent services." (citation omitted)).

The tariffs that are presently before the Court are plagued by none of these issues.  To begin with, Plaintiffs' "end office access services" may consist of "switching," or "routing," or any other "functional equivalent."  (ECF No. 92-5, § 3.3.3; see also id. at 10 ("CORE0012340").)  When calls are "routed" by Plaintiffs, as they indisputably are, (SOF, ECF No. 91, at ¶ 19), they may be sent directly or indirectly to the call recipient, (ECF No. 92-5, § 3.3.3).  Moreover, the tariffs establish that "end office access services" are a category of "switched access service," (id. § 3.3), which is defined as follows:

> Access to the network or facilities of the Company for the purpose of originating or terminating calls. Switched Access Service is available to carriers, as defined in this rate sheet. Switched access service includes services and facilities provided for the origination or termination of any interstate or foreign calls regardless of the technology used in transmission, including, but not limited to, local exchange, long distance, and data communications services that may use either TDM or Internet

protocol ("IP") or other technology, or a combination of technologies. Switched Access Service includes, but is not limited to, the functional equivalent of the incumbent local exchange carrier interstate exchange access services typically associated with following rate elements: carrier common line (originating); carrier common line (terminating); local end office switching; interconnection charge; information surcharge; tandem switched transport termination; tandem switched transport facility (per mile); tandem switching; common transport multiplexing; and common trunk port. Consistent with 47 C.F.R. § 61.26(a)(3)(ii), Switched Access Services includes the origination of calls from, or the termination of calls to, any retail end user, either directly or via contractual or other arrangements with an affiliated or unaffiliated provider of interconnected VoIP service, or a non-interconnected VoIP service, that does not itself seek to collect reciprocal compensation charges prescribed by this subpart for that traffic, regardless of the specific functions provided or facilities used.

(Id. at 14 ("CORE0012344").)

Furthermore, it is not at all clear that the FCC's 2019 order even applies to a LEC in the same position as Plaintiffs.  The 2019 order was issued to give further clarity to the 2011 Transformation Order.   The Transformation Order explicitly refers to the compensation opportunities for "multiple providers" in the call path.  Transformation Order, 26 FCC Rcd. 17663, at ¶ 970.  Retail VoIP service providers are not subject to FCC regulation, but depend on LECs that are wholesale partners for interconnection and compensation.  Id.  From time to time, such LECs may partner with retail VoIP providers, in which case the LECs are entitled to charge in conformity with their tariffs, even if they are using modern technology that is the functional equivalent of legacy systems.  Id. at ¶¶ 968 & 970.  Wholesale LECs may, in fact, do business with each other, both contributing inputs to a retail VoIP service.  Id. at ¶ 959.  In that case, one (or both) LECs may be remote from their end user.  Yet they are still entitled to be paid under their tariffs.  Id. at ¶ 970.

This latter circumstance is most descriptive of Plaintiffs' business model.  It is undisputed that Plaintiffs purchase their 8YY traffic from entities that are closer to the call initiator in the call path.  (SOF, ECF No. 91,at ¶¶ 11 & 12.)  On occasion, the traffic is purchased from retail telecom

companies; more often than not, though, it is purchased from other traffic wholesalers.  (Id.)  In either case, Plaintiffs are not in direct privity with their end user, but they are nonetheless providing telecommunications services that are necessary for the calling party's call to be completed. Accordingly, it is not at all clear that the FCC's 2019 order—suggesting that a LEC cannot charge for end office VoIP-PSTN switching unless it directly interconnects to a physical last-mile facility—is even applicable to a remote participant in the call path.

The final matter to address in this section is Defendant's assertion that no Plaintiff can prove that it provided "access services."  This is utterly without merit.

Section 3.3.4 of the applicable tariffs authorize Plaintiffs to conduct database queries through the 8YY database on toll-free traffic routed through their network.  (ECF No. 92-5.) Defendant has asserted—as an undisputed fact—that, "[o]n most calls, [Plaintiffs] perform[] a 'database dip' to determine which long distance carrier serves the called party/toll free customer." (SOF, ECF No. 91, at ¶ 17.)  Since database queries are a component of access services, Defendant has effectively conceded that Plaintiffs performed access services.

In similar fashion, § 3.3.5 of the tariffs authorizes Plaintiffs to route toll-free traffic as directed by the calling party.  (ECF No. 92-5.)  It is an undisputed fact—according to Defendant— that Plaintiffs "received toll-free calls," and routed those calls to AT&T for delivery to AT&T's customers.  (SOF, ECF No. 91, at ¶¶ 19-21.)  This, too, is conceded, as well as the fact that Plaintiffs provided "end office access services," (Id.; ECF No. 92-5, § 3.3.3.)

Consistent with the foregoing discussion, Defendant's arguments in favor of summary judgment on the issue of access charges must be denied.

**V.    AS A CONSEQUENCE OF DEFENDANT'S FAILURE TO OBSERVE THE DISPUTE RESOLUTION PROCEDURE OF PLAINTIFFS' TARIFFS, ALL OF AT&T'S DEFENSES TO NON-PAYMENT SHOULD BE DISREGARDED.**

Plaintiffs would be remiss without offering this final observation: None of AT&T's arguments for non-payment ought to be considered.   Each of Plaintiffs' tariffs contain a comprehensive dispute resolution procedure.  (ECF No. 92-5, at § 2.10.4.)  Subsection A required Defendant to submit a "documented claim" for the amounts in dispute "within sixty (60) days of the invoice date of the bill for the disputed services."   Defendant never did.   By letter dated September 21, 2018, AT&T sent Plaintiffs a letter asserting that Defendant had done "numerous studies"  and  "determined that virtually 100% of [Plaintiffs'] traffic was 'spoofed and/or fraudulent.'"  (SOF, ECF No. 91, at ¶ 35; see also ECF No. 92-42.)  At that time, AT&T did not provide any documentation to substantiate its assertions; it has still never done so.  Not only has AT&T failed to produce "numerous studies" to evidence its claim of fraud, it has yet to produce a single one.

Subsection B required Defendant to "pay any undisputed charges in full by the due date of the disputed invoice(s) and in any event, prior to or at the time of submitting a good faith dispute." (ECF No. 92-5, at § 2.10.4(B).)  It never has.  Now, Defendant contends that "roughly $5.5 million of approximately $9.85 million" in total damages sought are uncompensable "end office charges." (Def.'s Memo. Supp., ECF No. 93-1, at 4.)   Plaintiffs have already explained why this assertion is without merit.  But it does lead to a very simple question: since Defendant is apparently no longer contesting the other types of switched access services authorized by the tariffs and charged by Plaintiffs, why has AT&T not honored the tariff and paid the undisputed balance of roughly $4.35 million?  See, e.g., In re Connect America Fund, 30 FCC Rcd. 1587, at ¶ 23 n.83 (setting forth a sampling of recurring grievances submitted by telecommunications carriers against Defendant for withholding payment).

<u>**CONCLUDING STATEMENT**</u>

Consistent with the foregoing arguments and authorities, and for any other reason that may become apparent to the Court, Plaintiffs respectfully request the entry of an Order that denies Defendant's Motion for Summary Judgment in its entirety, and provides for such other and further relief as the Court deems just and proper.

Dated: July 14, 2023                    Respectfully submitted,

<u>*s/ Zachary E. Nahass*</u>
Zachary E. Nahass, Esq.
CGA Law Firm
135 North George Street
York, PA 17401
(o) 717.848.4900
(e) znahass@cgalaw.com

Ralph Gleaton, Esq. *(pro hac vice)*
Gleaton Law Firm, P.C.
Post Office Box 5739
Greenville, SC 29606
(o) 864.444.4178
(e) ralph@gleatonlaw.com

Steven Edward Buckingham, Esq. *(pro hac vice)*
The Law Office of Steven Edward Buckingham
16 Wellington Avenue
Greenville, SC 29609
(o) 864.735.0832
(e) seb@buckingham.legal