IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CORE COMMUNICATIONS, INC., et al.,** *Plaintiffs*, v. **AT&T CORP.,** *Defendant*. | Case No. 2:21-cv-02771-JDW |

## **MEMORANDUM**

In a game of "telephone," the problems don't come from the people at either end of the call; they come from the jumble in the middle. This case is about a game of telephone in real life, if you had to pay everyone along the chain. Since 2011, Core Communications and its affiliates have had tariffs to provide Switched Access Services. Core bills AT&T for those services, but AT&T stopped paying Core in 2018, contending that nearly all Core's call traffic was spoofed or fraudulent. Fortunately, a jury need not wade through a morass of data to resolve that issue, because Core's tariffs did not authorize Core to bill for those services in the first place. This means that Core cannot collect the unpaid access charges it seeks, and AT&T is entitled to summary judgment on all of Core's claims.

## I. BACKGROUND

### A. Core's Business Model

Core Communications, Inc., CoreTel Delaware, Inc., CoreTel New Jersey, Inc., CoreTel Virginia, LLC, and CoreTel West Virginia, Inc. (collectively "Core") are competitive local exchange carriers ("CLECs") that provide access services as intermediate carriers. As part of its business, Core purchases aggregated toll-free telephone calls ("8YY traffic") from various originating providers. Core has no visibility regarding the individuals or entities who are making the actual phone-calls. Because the 8YY calls are toll-free, the callers do not pay any fees to place the calls. Once Core receives an 8YY call, it performs a database query to determine which long-distance carrier (referred to as an interexchange carrier ("IXC")) should receive the call. Then, Core routes the call to a third-party carrier known as a tandem. The tandem delivers the 8YY traffic to an IXC. At that point, the IXC delivers the call to its customer. In general, the call path looks like this:



AT&T Corp. is one of the IXCs to which Core delivers 8YY traffic. The parties receiving the calls are AT&T's toll-free customers. Core does not have a service contract with AT&T. Instead, it bills AT&T for Switched Access Service pursuant to tariffs on file with the FCC and various state public utility commissions. Switched Access Service is

available to Core's customers, like AT&T, "for their use in furnishing service" to their end users (like the toll-free customers) when Core's network or facilities are used to originate or terminate calls from or to a Core end user. (ECF No. 92-5 at §§ 3.1.1, 3.2.1.)

Beginning in 2018, AT&T began withholding payment for portions of Core's invoices, claiming that "virtually 100%" of the 8YY traffic from Core was "associated with spoofed and/or fraudulent traffic." (ECF No. 92-43.) By 2020, Core contends that AT&T stopped making substantially all payments owed to Core under its tariff. As a result, Core contends that AT&T owes it millions of dollars in unpaid access charges and associated late fees.

### B. Core's Tariffs

Core's claims in this case arise under substantially identical tariffs that it has filed with the FCC and state public utilities commissions. Because the relevant terms in the tariffs are the same, I will cite to and reference the federal tariff on file with the FCC (the "Tariff"). Under its Tariff, Core may provide "Switched Access Service"—*i.e.*, access to Core's network or facilities "for the purpose of originating or terminating calls." (ECF No. 92-5 at 6th Revised Page No. 13.) This service is available to customers—customers in this case being other telecommunications companies, such as AT&T—"for their use in furnishing service to Customers' End Users." (*Id.* at § 3.1.1.) But Switched Access Service is only available to customers "when originating or terminating calls from or to a Company End User." (*Id.* at § 3.2.1.) A "Company End User" is a "person, firm, partnership,

corporation or other entity … that subscribes to or **otherwise uses** the local exchange or other telecommunications services of [Core]." (*Id.* at 1st Revised Page No. 7 (emphasis added).)

The Tariff contains several dispute resolution provisions. Of note here, the Tariff mandates that a customer "submit a documented claim for the disputed amount … to [Core] within sixty (60) days of the invoice date …." (ECF No. 92-5 at § 2.10.4(A).)

C.	**Procedural History**

On June 22, 2021, Core sued AT&T, claiming that by failing to pay Core for access services, AT&T breached the applicable federal and state tariffs, including tariffs that Core filed with the FCC, Delaware Public Service Commission, Maryland Public Service Commission, Pennsylvania Public Utility Commission, New Jersey Board of Public Utilities, Virginia Corporation Commission, and West Virginia Public Service Commission. AT&T moved for summary judgment on all of Core's claims against it, and that motion is ripe for disposition.

II.	**LEGAL STANDARD**

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary

judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted). However, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead, he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (cite omitted); *see also* Fed. R. Civ. P. 56(c)(1)(A)-(B). If he fails to make this showing, the court may "consider the fact undisputed for purposes of the motion" and "grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it[.]" Fed. R. Civ. P. 56(e)(2)-(3).

## III. DISCUSSION

The Parties' dispute centers on various terms of the Tariff, including what constitutes Switched Access Service, and the dispute resolution provision. In general, "a tariff is to be construed as any other contract[.]" *Carrier Serv., Inc. v. Boise Cascade Corp.*, 795 F.2d 640, 642 (8th Cir. 1986) (citation omitted). And "its terms must be taken in the sense in which they are generally used and accepted[.]" *Penn Cent. Co. v. Gen. Mills, Inc.*, 439 F.2d 1338, 1340 (8th Cir. 1971) (same).

### A. Dispute Resolution Procedures

"[V]alid tariffs 'conclusively and exclusively control the rights and liabilities between' a carrier and its customer." *Qwest Corp. v. AT & T Corp.*, 371 F. Supp. 2d 1250, 1251 (D. Colo. 2005) (quotation omitted). Courts therefore enforce tariffs that include a dispute resolution procedure and warn customers that a failure to raise a dispute will

waive that dispute. *See, e.g.*, *Intervision Sys. Techs., Inc. v. InterCall, Inc.*, 872 N.W.2d 794, 798 (Neb. Ct. App. 2015) (customer agreed to any charges not disputed within 30 days); *Pac. Lightnet, Inc. v. Time Warner Telecom, Inc.*, 318 P.3d 97, 123 (Haw. 2013) (billing disputes not submitted within 120 days "shall be deemed waived"); *Powers L. Offs., PC v. Cable & Wireless USA, Inc.*, 326 F. Supp.2d 190, 193 (D. Mass. 2004) (failure to dispute bill "shall be deemed an admission of the accuracy of the entire contents of the bill, and shall foreclose any opportunity to challenge the accuracy of any portion of that bill at a later date"); *MCI Telecomms. Corp. v. Best Tel. Co.*, 898 F. Supp. 868, 874 (S.D. Fla. 1994) (tariff provided that if customer did not dispute invoice within 6 months, then the invoice was "deemed to be correct and binding on the customer").

Core suggests that AT&T waived any dispute it might have. But Core's Tariff is meaningfully different than the tariffs at issue in the cases where the courts found waiver. Unlike the contracts and tariffs at issue in those cases, Core's Tariff is silent about what happens if a customer withholds payment and fails to submit a dispute. Instead of including some sort of waiver provision, the Tariff just mandates that a customer "submit a documented claim for the disputed amount … to [Core] within sixty (60) days of the invoice date …." (ECF No. 92-5 at § 2.10.4(A).) It says nothing about the consequence of failing to comply. At most, the Tariff permits Core to apply late fees to any withheld payments if it determines that the dispute was unfounded.

6

I cannot insert additional terms into the Tariff or provide Core with greater rights than the Tariff provides. Because the Tariff does not provide notice that failure to comply with a dispute resolution provision would constitute a waiver, AT&T did not waive its rights to challenge Core's claims for payment when it withheld payment and failed to comply with the Tariff's dispute resolution process.

B.      **Switched Access Service**

No one used Core's network or facilities to originate or terminate[1] calls from or to a Company End User, so Core cannot recoup the access charges it seeks from AT&T. Neither the 8YY callers nor AT&T's customers (as the recipients of those calls) subscribe to Core's local exchange or other telecommunications services. In addition, Core does not contend that AT&T's toll-free customers use Core's services. Instead, the Parties dispute whether a caller "otherwise uses" Core's services when it makes a toll-free call to AT&T's customer. Thus, to resolve this dispute, I must interpret the terms of the Tariff.

On its own, the term "uses" is not ambiguous. When Core adopted its Tariff, "use" meant to "take, hold, or deploy (something) as a means of accomplishing a purpose or achieving a result; employ." New Oxford American Dictionary, 1907 (3d ed. 2010). Certainly, on some level, 8YY callers use Core's services to make calls to AT&T's customers

---

[1] The charges at issue in this case are originating access charges; there is no dispute about terminating access charges.

because those services are part of the call path, but the definition of Company End User doesn't stop there.

Instead, the definition requires that the caller use Core's telecommunications service and local exchange service (a type of telecommunications service). Core's tariff defines "Telecommunications Service" as "the offering of telecommunications **for a fee** directly to the public[.]" (ECF No. 92-5 at 1st Revised Page No. 14 (emphasis added).) This mirrors the statutory definition. *See* 47 U.S.C. § 153(53) (2010); *In The Matter Of Petition For Declaratory Ruling That Pulver.com's Free World Dialup Is Neither Telecommunications Nor A Telecommunications Service*, 19 F.C.C. Rcd. 3307, 3312-13 ¶ 10 (2004) ("[I]n order to be a telecommunications service, the service provider **must assess a fee** for **its** service.") (emphasis added). Thus, use of Core's telecommunications services requires the payment of a fee. In addition, because Company End Users are those who use **Core's** services, it follows that those users must pay the fee to Core. To read the Tariff any other way would be unreasonable, so I decline to do so. *See Carrier Serv.*, 795 F.2d at 642 ("[A] tariff ... should be interpreted in such a way as to avoid 'unfair, unusual, absurd or improbable results.'") (quotation omitted).

Core's contention that a Company End User includes anyone who initiates an 8YY call that comes across its network—"no matter how remote" and regardless of whether that user pays Core (ECF No. 95 at 18) —stretches the Tariff's language too far. Had Core intended for **any** caller to constitute a Company End User, it could have defined the term

to be any entity that subscribes to or otherwise uses local exchange or other telecommunications services in general. But it didn't; it specified that the caller must use *Core's* services.

My interpretation of Core's Tariff comports with persuasive authority from the FCC. For example, in *Northern Valley*, the FCC determined that Northern Valley's revised tariff was unlawful because it stated that "an End User need not purchase any service provided by [Northern Valley]." *In the Matter of Qwest Commc'ns Co., LLC v. Northern Valley Commc'ns, LLC*, 26 F.C.C. Rcd. 8332, 8336 ¶ 7 (2011). Similarly, Core interprets its Tariff as authorization "to charge IXCs for calls to or from entities to whom [Core] offers its services free of charge[.]" *Id.* at 8337 ¶ 9. However, the FCC reasoned that such a tariff provision is unlawful because the FCC's "access service rules and orders establish that a CLEC may tariff access charges only if those charges are for transporting calls to or from an individual or entity to whom the CLEC offers service *for a fee*." *Id.* at 8336 ¶ 7 (original emphasis). Thus, "[a] CLEC's 'own end-users' do not include entities that receive free services from the CLEC." *Northern Valley*, 26 F.C.C. Rcd. at 8337 ¶ 9. I will not adopt Core's interpretation of the term "otherwise uses" to refer to use without payment to Core because that interpretation would conflict with governing FCC rules. *See Great N. Ry. Co. v. Delmar Co.*, 283 U.S. 686, 691 (1931) (applying canon of construction to tariff that "where two constructions of a written contract are possible, preference will be given to that which does not result in violation of law").

9

Finally, to the extent Core's definition of Company End User is ambiguous as to whether a user must pay Core for services (which I do not think it is), that ambiguity would be construed against Core, as the Tariff's drafter. *See Jersey Cent. Power & Light Co. v. FERC*, 589 F.2d 142, 145 (3d Cir. 1978) ("[A]ny doubt as to the meaning [of a tariff] should be resolved against the filing utility."); *AT&T Corp. v. YMax Commc'ns Corp.*, 26 F.C.C. Rcd. 5742, 5755 ¶ 33 (2011) ("It is well-established … that any ambiguity in a tariff is construed against the party who filed the tariff[.]"). Thus, whether ambiguous or not, the outcome is the same: Pursuant to Core's Tariff, a Company End User is a person or entity that pays Core for the use of Core's local exchange or other telecommunications services.

Given my interpretation of Core's Tariff, Core may not collect any of the access charges it seeks from AT&T because those charges all stem from the origination of 8YY calls, and there is no dispute that the 8YY traffic was "toll free," meaning that the callers did not pay a fee to make the calls. Core admitted that it charged AT&T for the 8YY traffic it routed to AT&T between July 2017 and June 2021 and that no upstream providers paid any fees for the service. (*See, e.g.*, ECF No. 92-11 at 5-8; ECF No. 92-12 at pages 4-7 of 10.) This means that none of the 8YY callers nor any of the originating providers can be a Company End User because they did not pay Core a fee to use its local exchange or other telecommunications services. In fact, Core paid the originating providers to acquire the 8YY traffic. In addition, AT&T's customers who received these calls did not pay a fee to Core. Instead, they paid AT&T for toll-free service. This means that they are not Company

End Users, either. Because no one used Core's network or facilities to originate a call from or to a Company End User, Core cannot charge AT&T for Switched Access Service under its tariff and cannot collect the access charges it seeks from AT&T in this action.

## IV.     CONCLUSION

Core cannot collect the originating access charges it seeks from AT&T in this matter because Core did not provide Switched Access Services pursuant to its Tariff when it routed those calls to AT&T. Thus, AT&T is entitled to summary judgment on Core's claims for breach of tariff. An appropriate Order follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

October 13, 2023